*Decision will be entered under Rule 50.*

JOHN N. HAGAR AND HELEN D. HAGAR, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1609–63. Filed January 26, 1965.

John N. Hagar, for the petitioners.
*Sheldon Chertow*, for the respondent.

FAY, *Judge:* The Commissioner determined a deficiency in petitioners' income tax for the year 1959 in the amount of $117.12. The only issue for decision is whether the sum of $436.70 received by petitioner John N. Hagar representing strike benefits is includable in his gross income.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference.

---

[1] The Commissioner conceded that an additional $13 received by petitioner John N. Hagar is excludable from his gross income.

John N. Hagar (hereinafter referred to as petitioner) and Helen D. Hagar (hereinafter referred to as Helen) are husband and wife with their residence in Glendale, Mo. They filed their joint Federal income tax return for the taxable year 1959 with the district director of internal revenue at St. Louis, Mo.

On July 6, 1944, petitioner was employed by the St. Louis Star-Times as a sports writer. Petitioner remained in the employ of the St. Louis Star-Times until July 30, 1946. On July 6, 1956, petitioner was employed in the editorial department of the Globe-Democrat Publishing Co. (hereinafter referred to as the Globe) as a copy editor. The Globe publishes a morning newspaper in St. Louis, Mo., called the St. Louis Globe-Democrat. At all times material hereto petitioner was employed in the editorial department of the Globe.

On July 11, 1944, petitioner applied for union membership to the St. Louis Newspaper Guild, Local No. 47 of the American Newspaper Guild. The St. Louis Newspaper Guild will hereinafter be referred to as the local guild and the American Newspaper Guild will hereinafter be referred to as the ANG. The membership application was accompanied by an initiation fee of $3 and 1 month's dues of $1.75. After petitioner left the St. Louis Star-Times his membership in the local guild lapsed. On August 2, 1956, at about the time he was employed by the Globe, petitioner submitted another application for union membership to the local guild. The latter application for membership, which was signed by petitioner, contained the following statement:

I designate the American Newspaper Guild and its Local my agent in collective bargaining, and authorize the American Newspaper Guild and its Local to represent me before any Board, Court, Committee or other Tribunal, in any matter involving collective bargaining, and I authorize the American Newspaper Guild and its Local to represent me in adjusting any grievances I may have in connection with my employment. I pledge myself to abide by the Constitution of the American Newspaper Guild and the By-Laws of the Local Guild.

Since August 2, 1956, petitioner had continued to remain a member in good standing in the local guild.

The ANG was established in 1933. The international convention is the supreme authority of the ANG, except as the membership overrides an act of the convention by subsequent referendum. Between conventions the affairs of the ANG are administered by the international executive board (hereinafter referred to as IEB). The IEB consists of the international officers of the ANG, nominated in convention and elected by referendum vote. Between conventions the constitution is interpreted by the IEB. The purpose of the ANG as stated in its constitution is as follows:

SECTION 2. The purpose of the American Newspaper Guild shall be to advance the economic interests of its members, * * * to foster friendly cooperation with all other workers, and to promote industrial unionism in the newspaper industry.

The membership of the ANG functions through local guilds. The local guild was organized under a charter granted to it by the ANG on March 20, 1934. Under the terms of the charter, the local guild is "empowered in accordance with the Constitution of the American Newspaper Guild to initiate members, collect dues, and guarantee its members the assistance of the entire American Newspaper Guild as far as such may be in accordance with the Constitution."

The local guild is governed by the constitution of the ANG and by the bylaws of the local guild, which are supplemental thereto. The general membership meeting is the supreme authority of the local, except that its decisions may be overruled by a membership referendum. Between general meetings of the local, its governing body is the executive committee, which administers its affairs, but the executive committee cannot make any decision permanently establishing the general policies of the local. It is the duty of the executive committee, between general membership meetings of the local, to administer guild policy as set forth in the ANG constitution, in the bylaws of the local, and in the various legislative enactments of the local general membership. To exercise this function, the executive committee is empowered to authorize whatever special committees it deems necessary.

At all times material hereto the local guild was composed of four units. A unit consists of members of the local guild who work for the same employer. During the period at issue, the four shop units consisted of members employed by the Globe, the Pulitzer Publishing Co., the East St. Louis Journal, and a radio and television station in St. Louis, Mo., known as KMOX. The name of each unit will hereinafter be prefixed by the name of the respective shop employer. The unit exists only for administrative purposes and for representation of its members within the local. It does not have a separate constitution or bylaws and does not enter into agreements.

On April 3, 1958, a written contract was entered into between the Globe and the local guild. The contract provided that the local guild would be the sole collective bargaining agent for the employees of the Globe in departments, including the editorial department, specifically listed in the contract. Paragraph 2 of article I of the aforementioned contract provided that the Globe maintain a closed shop as follows:

2. The Publisher shall require as a condition of employment of any employee in the departments listed in the Preamble hereof that he be and remain a member of the Guild in good standing during the term of this contract, except as hereinafter provided. If any employee be not a Guild member at the time of the signing of this agreement or at the time of his acceptance of employment, he shall be required to become a member of the Guild on the 31st day following the date of his employment or the day of the execution of this agreement, whichever occurs later.

The aforesaid contract was to expire on December 31, 1959. Under its terms the contract could be reopened by either party for further negotiating on a pension program, adjustment of weekly wages and commissions, minimum wage brackets and classifications, and medical plans and automobile allowances. By giving notice of at least 60 days in advance, the contract was reopened by the local guild for the purpose of negotiating on a pension program and job security.

A meeting of the membership of the Globe unit was called and voted to strike against the Globe. The petitioner attended the meeting and voted for the strike. Thereafter on February 19, 1959, the executive committee of the local guild voted to call a strike of the Globe unit against the Globe to become effective on February 20, 1959.

The pertinent provisions of the ANG constitution regarding strikes are as follows:

ARTICLE VIII.
Local Guilds

SECTION 11. Local funds shall be used only for legitimate operating expenses, for the financing of strike activities and for the purpose of assisting labor and other organizations friendly to the ANG and the labor movement. * * *

SECTION 12. (a) Each Local shall establish a Local Defense Fund effective with its first fiscal year beginning on or after January 1, 1959.

(b) There shall be deposited to this fund, no later than the 30th day after the expiration of each fiscal quarter, an amount equal to 5% of the Local's gross income from monthly dues in the preceding fiscal quarter, unless on such 30th day the assets in the Local Defense Fund are equal to or greater than $100 for each member in the last month of the preceding quarter.

\*     \*     \*     \*     \*     \*     \*

(d) Expenditures from the Local Defense Fund may be made only to support the Local's strike or other defense activity, or other activities of an emergency nature, and to contribute to other unions.

\*     \*     \*     \*     \*     \*     \*

SECTION 18. Locals shall do all in their power to strengthen the labor movement in their respective areas.

\*     \*     \*     \*     \*     \*     \*

ARTICLE XVII.
Finances

SECTION 12. * * * Expenditures for strike activities, * * * shall be made from the International Defense Fund, at the direction of the IEB. * * *

ARTICLE XIX.
Strikes and Lockouts

SECTION 1. The IEB shall be kept fully informed of developments which may lead to a strike or lockout.

SECTION 2. (a) A strike may be called by the governing body of a Local if the Unit involved has voted approval. In cases where more than one Unit may be called on strike, all these Units shall be considered as one Unit.

\*     \*     \*     \*     \*     \*     \*

(c) If ANG funds are to be used at any time during a strike, the IEB must be advised of the strike in advance and the strike must be approved by the IEB.

The pertinent parts of the Local Guild bylaws are as follows:

ARTICLE III.
Executive Committee

SECTION 7. The Executive Committee shall have the right to call a strike or strikes, provided: (a) a strike vote has been adopted by a majority of those present and voting at a meeting of the unit or units directly involved and called for that purpose, (b) the International Executive Board has been fully informed of the circumstances.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

ARTICLE X.
Guild Finance

SECTION 6. A local Defense Fund may be kept in reserve for use in an emergency, which shall be defined as a situation involving a strike or lockout of members of the St. Louis local. The Defense Fund also may be used for relief of members kept from their work as result of legally observing the picket line of another union, provided such use of funds is authorized by the Executive Committee with due regard to duration and other circumstances in each such instance. \* \* \*

The ANG sent a letter dated January 7, 1959, with attachment thereto dated January 1, 1959, and signed by William J. Farson, executive vice president of the ANG, to all local presidents and treasurers concerning ANG's strike preparation and strike policy. This letter, with attachment thereto, was received by the local guild. The ANG's policy regarding its requirement that local guilds maintain a defense fund is set forth in the strike administrative letter as follows:

The action of the San Jose Convention in amending the ANG Constitution to require that each Local establish a Local Defense Fund contemplates the payment of supplemental strike and lockout benefits out of local funds.

The IEB, in its report to the San Jose Convention, said:

"We are no longer planning wisely if we call upon our membership to renew their offenses for the added and strengthened benefits they need and deserve if we don't provide the necessary resources upon which they can rely. It is not feasible for the International to provide all these resources. Strikes and lockouts are a common burden, for ANG and Locals alike. They share a responsibility, and they must travel a common road to meet it."

The letter also set forth the policy of the ANG regarding the payment of strike benefits as follows:

ANG benefits be paid only to members in good standing.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

It is also ANG policy that no benefits be paid to any able-bodied member who refuses to picket or perform other strike or lockout duties required of him.

At the commencement of the strike on February 20, 1959, there were 339 members in good standing in the Globe unit. The strike activities of the Globe unit were conducted by strike committees which were approved by the executive committee of the local guide as follows:

*Committee name*

| | |
|---|---|
| Steering Committee | Finance Committee |
| Legal Committee | Publications, Publicity, and Speakers Committee |
| Headquarters Committee | |
| Commissary Committee | Morale and Entertainment Committee |
| Fund Raising Committee | |
| Welfare Committee | Manpower and Work Records Committee |
| Picket Committee | |

The Steering Committee served to coordinate the body of the strike and supervise the functions and activities of other strike committees. Minutes of the Steering Committee regarding the eligibility of members for strike benefits reveal the following:

[Feb. 24, 1959] Welfare Committee has final authority to determine eligibility. *Exceptions* to FIRST WEEK PAYMENTS:
  1. those who crossed the Picket Lines.
  2. those who REFUSED to do Picket Duty without sufficient cause.

[Feb. 27, 1959] STRIKE BENEFIT ELIGIBILITY for 2nd and Subsequent Weeks. Drafting Committee * * * to present to * * * Welfare the qualifications on the following—
  1. Refusal to walk the Picket Line.
  2. Physical excuses for not walking.
  3. Time required each week to qualify.
  4. Other income.

[Feb. 28, 1959] Strike Picket Committee.
Anyone missing a tour of duty owes us that time in addition to regularly scheduled hours. If this failure to walk picket lines continues, the case will be referred to Welfare.

At the commencement of the Globe strike, the local guild had $121,800 in its local defense fund. To accumulate the amount in the defense fund, members of the local guild, each year since sometime in the 1940's, voluntarily contributed a sum equal to their weekly increase in pay for the respective year. Some of the members of the local guild contributed and some did not, although a majority were contributors. The voluntary contributions had nothing to do with dues, assessments, or initiation fees. In 1957 and 1958 petitioner voluntarily contributed a total of $13 to the local defense fund.

On February 24, 1959, the executive committee voted to establish two funds to be placed in separate checking accounts. One account was called the "St. Louis Newspaper Guild Strike Benefit Account" (hereinafter referred to as the strike benefit fund) and the other checking account was called the "St. Louis Newspaper Guild Strike Administrative Account" (hereinafter referred to as the strike administrative fund). On February 24, 1959, the executive committee also voted to appropriate the total amount of $35,000 from its local defense fund to the strike benefit fund and the strike administrative fund in the respective amounts of $25,000 and $10,000.

The executive committee further resolved at the meeting of February 24, 1959, that checks drawn on the strike benefit fund bear the signature of an international representative of the ANG and any one of the five local guild's officers authorized to sign checks. The executive committee further resolved that checks drawn on the strike administrative fund bear the signatures of any two of the five local guild's officers authorized to sign checks.

During the period of the Globe strike, the total amount of $40,518.07 was placed in the strike administrative fund and came from an appropriation out of the local defense fund in the amount of $10,000, assessments of members of the three other shop units, amounts received from other locals of the ANG, other unions, and individuals. The strike administrative fund was used to pay office and administrative expenses incurred during the Globe strike. In addition, loans to members of the Globe unit were paid out of the strike administrative fund. The amount of $23,000 was transferred from the strike administrative fund to the strike benefit fund.

During the period of the Globe strike, the total amount of $168,612.88 was placed in the strike benefit fund and came from the following sources:

| | |
|---|---|
| ANG international defense fund | $120,000.00 |
| Local defense fund | 25,000.00 |
| Transfer from strike administrative fund | 23,000.00 |
| Checks drawn on the strike benefit fund and not cashed | 589.72 |
| Cash refunds | 23.16 |
| Total | 168,612.88 |

During the period of the Globe strike, only weekly strike checks were issued out of the strike benefit fund to eligible members of the Globe unit. Eligibility of members of the Globe unit to receive weekly strike checks was dictated by ANG policy, under the following criteria: (1) Only members of the Globe unit in good standing were eligible for strike checks; (2) all able-bodied members of the Globe unit were required to picket in order to receive weekly strike checks;[2] (3) those members of the Globe unit who were physically unable to picket were required to actively participate in the strike by serving on various strike committees in order to receive weekly strike checks; and (4) Globe unit members who were ill received weekly strike checks without doing picket duty or serving on strike committees. A member of the local guild is in good standing if he is not more than 1 month in arrears on any of his constitutional obligations.[3] Each member of the Globe unit who was on strike during the period of the Globe

---

[2] One of the reasons for this rule, as testified to by the executive secretary of the local guild, was to assure that there would be adequate personnel to man the picket lines and to do all the work that is necessary in carrying on a strike.

[3] One of the offenses which may bring disciplinary action causing expulsion or suspension from the local guild is the working for or in a shop which is on strike.

strike, in order to remain in good standing, was required to pay dues in the amount of $0.10 per month. A member in bad standing would be ineligible to receive the weekly strike check. During each of the months of March, April, and May 1959, the amount of $0.10 was deducted from the amount received from the strike benefit fund by the eligible Globe unit member.

In connection with the strike work requirements, a questionnaire entitled "Strike Work Questionnaire" was distributed at the commencement of the Globe strike by the Manpower and Work Records Committee to the members of the Globe unit. The members of the Globe unit were asked to answer questions concerning their participation in various strike activities, and whether they were physically able to picket. They were also requested to indicate three preferences of six 4-hour tours of picket duty. The Strike Work Questionnaire contained the statement that "All strikers are required to do a tour of picket duty each week unless excused for physical reasons."

The part of the Strike Work Questionnaire which referred to picketing was detached from the part relating to other strike activities. A weekly schedule showing the days and number of hours of picket duty required of each member of the Globe unit was prepared by the Picket Committee. During the course of the strike, weekly schedules of picket duty listing the days, hours, and the names of the members of the Globe unit were prepared by the Picket Committee. Similar procedures were followed by the Manpower and Work Records Committee.

Each day of the duration of the Globe strike, the various committees filled out the daily work record. The name of the committee, the date, the name of the employee, and the hours worked would be recorded on the daily work record by the committee chairman. With regard to the daily work record submitted by the Picket Committee, the picket captain of a respective strike shift would prepare the daily work record for members of the Globe unit assigned to his picket shift.

The daily work record was turned in daily by the various committee chairmen and picket captains to the Manpower and Work Records Committee. A member of the latter committee would transfer the information contained on the daily work record to separate cards maintained for each member of the Globe unit. The number of hours each member of the Globe unit performed picket duty or other assigned strike activities during the week was computed weekly on the individual cards.

From the information contained on its records, the Manpower and Work Records Committee prepared a list of members of the Globe unit who were eligible for weekly strike checks and a list of members who were ineligible for weekly strike checks. These lists would then be furnished to the Welfare Committee.

The Welfare Committee caused the list of eligible members of the Globe unit to be typed on a weekly report entitled "Strike Benefit Fund Report" which contained columns for the following information: "Check No.," "Name [of Globe Unit member]," "ANG Benefit," "Local Benefit," "Total Benefit," and "Signature [of Globe Unit member]." At the end of each week of the Globe strike, checks drawn on the strike benefit fund were made payable to each eligible member of the Globe unit. Each member of the Globe unit was required to come to either the local guild or Strike Headquarters and sign, after his typewritten name, the Strike Benefit Fund Report of the respective week in order to obtain his check. Weekly strike checks were not issued to any eligible member of the local guild who received income from a temporary job in excess of the weekly amount he would have received from the strike benefit fund. Any member of the Globe unit who received income from a temporary job less than the weekly amount he would have received from the strike benefit fund if he was not employed, would receive the difference between such amounts provided he actively participated in the strike.

During the course of the Globe strike, a questionnaire captioned "Interested in a Temporary Job?" was provided by the Welfare Committee to members of the Globe unit who were interested in obtaining outside employment. The questionnaire was returned to the Welfare Committee. The questionnaire contained the following statement:

If you accept a temporary job at a salary lower than your weekly strike benefits you will receive a check each week from the Welfare Committee to make up the difference, provided you continue to participate in the strike.

During the first week of the Globe strike, the amount of the checks issued to eligible members of the Globe unit came from local defense fund moneys placed in the strike benefit fund and was based upon the following ANG schedule:

*ANG Strike and Lockout Benefits*

Single member or married member, spouse working_____ $15 a week
Married member, spouse not working_____ $25 a week
Each additional dependent_____ $10 a week
MAXIMUM benefit_____ $60 a week

or

90% of salary, whichever is the lesser

Within a period of 2 weeks before the strike was called by the executive committee on February 19, 1959, a questionnaire captioned "Strike Questionnaire, Globe-Democrat Unit" was distributed by the Welfare Committee to each member of the Globe unit. The questionnaire asked each member of the Globe unit whether he was married, whether his spouse was employed, the number of his unemployed children, the number of his other dependents, whether he had "any

unusual financial problems," whether he could obtain temporary work, and whether there was any reason why he would be unable to do picket duty. The questionnaire did not contain any questions concerning the amount of the member's prospective income from outside employment, the current amount of his dividend, interest, and rental income, the current amount of his spouse's income, and his current net worth.

Answers to questions contained on the "Strike Questionnaire, Globe-Democrat Unit" relating to whether a member of the Globe unit was married, whether his spouse was working, and the number of his unemployed children and other dependents, determined, by application to the aforesaid ANG schedule, the amount to be received by eligible members of the Globe unit out of the local defense fund part of the strike benefit fund (during the first week of the strike) and out of the international defense fund part of the strike benefit fund (during the second week of the strike and thereafter). During the second week of the Globe strike, and thereafter, the amount of the check issued to each of the eligible members of the Globe unit which came from the international defense fund part of the strike benefit fund was based on the aforesaid ANG schedule. In accordance with ANG policy, commencing with the fifth week of the strike, and thereafter, the amount of the check issued to each of the eligible members of the Globe unit which came from the international defense fund part of the strike benefit fund was increased by $5 provided the member was "not already receiving the maximum benefit payment."

During the second week of the strike no amounts received by eligible members of the Globe unit came from the local defense fund part of the strike benefit fund. Commencing with the third week of the strike, and thereafter, the executive committee of the local guild voted to supplement the amount received by eligible members by $5. Said amount was received from the local defense fund part of the strike benefit fund. Commencing with the fourth week of the strike, and thereafter, the executive committee of the local guild voted to supplement the amount received by eligible members by an additional $5. Said amounts were received from the local defense fund part of the strike benefit fund. Commencing with the sixth week of the strike, and thereafter, the executive committee of the local guild voted to supplement the amount received by eligible members by another additional $5. Said additional amounts were received from the local defense fund part of the strike benefit fund.

Petitioner filled out the questionnaire captioned "Strike Questionnaire, Globe-Democrat Unit" and returned it to the local guild. The petitioner answered that his wife was working. During the strike Helen worked for the General American Life Insurance Co., at a biweekly take-home pay of $152.93. He further answered that he had neither unemployed children nor other dependents. His answers

were "No" to the questions concerning whether he had any unusual financial problems, whether he could obtain temporary work, and whether there was any reason why he would be unable to do picket duty. Petitioner was not asked about his net worth. Nor was he questioned regarding the place where he lived or whether he had ready access to money in case of any emergencies. Petitioner lived in a home owned by himself and his mother as joint tenants. Petitioner was also a joint tenant with his mother and Helen in various savings accounts with substantial balances during the time in issue. In addition, petitioner had some dividend income during the time of the strike.

During each week of the Globe strike, petitioner was scheduled for picket duty by the Picket Committee. Petitioner performed the picket duty for which he was scheduled. Petitioner's name was placed on a list of members of the Globe unit eligible to receive the weekly strike checks. The petitioner's name was then typed on the Strike Benefit Fund Report. Petitioner appeared each week at Strike Headquarters, signed his name to the report and received his check. There was no correlation between the amount of picket or other strike duties performed by petitioner and the amount he received from the guild. The amount received by petitioner was based upon the aforementioned ANG schedule. A summary of the weekly checks issued to petitioner during the Globe strike for the period commencing February 20, 1959, and ending May 29, 1959, is as follows:

### JOHN N. HAGAR
*Record of weekly amounts received during Globe strike*

| Dates (week ending) | Amounts received from international defense fund | Amounts received from local defense fund | Total |
| --- | --- | --- | --- |
| Feb. 27, 1959 | | $15.00 | $15.00 |
| Mar. 6, 1959 | $15.00 | | 15.00 |
| Mar. 13, 1959 | 15.00 | 5.00 | 20.00 |
| Mar. 20, 1959 | 15.00 | 10.00 | 25.00 |
| Mar. 27, 1959 | 20.00 | 10.00 | 30.00 |
| Apr. 3, 1959 | 20.00 | 15.00 | 35.00 |
| Apr. 10, 1959 | 20.00 | 15.00 | 35.00 |
| Apr. 17, 1959 | 20.00 | 14.90 | 34.90 |
| Apr. 24, 1959 | 20.00 | 15.00 | 35.00 |
| May 1, 1959 | 20.00 | 15.00 | 35.00 |
| May 8, 1959 | 20.00 | 15.00 | 35.00 |
| May 15, 1959 | 19.90 | 15.00 | 34.90 |
| May 22, 1959 | 20.00 | 15.00 | 35.00 |
| May 29, 1959 | 19.90 | 15.00 | 34.90 |
| Total | 229.80 | 189.90 | 419.70 |

From the beginning of the Globe strike, bulletins and letters were issued to members of the Globe unit by the local guild, and picket instructions were issued to all pickets and picket captains by the Picket Committee.

The following statements appeared in the Strike Bulletins:

[Feb. 24, 1959] * * * To be eligible for strike benefits, able-bodied members must perform picket duty. * * *

[Feb. 26, 1959] In accordance with ANG policy, only those members walking the picket line and/or performing assigned duties at strike headquarters will receive benefits.

[Mar. 12, 1959] All employees must put in their time on the picket line to be eligible for strike benefit checks * * *

[Mar. 18, 1959] You must walk the picket line to be eligible for your weekly check.

[Apr. 13, 1959] * * * Members whose salaries [from temporary jobs] are less than their strike benefits will receive the difference each week if they continue some strike activities.

[May 8, 1959] Until the last "t" is crossed and the last "i" is dotted, members of the Globe-Democrat Unit have been reminded that picketing must continue and that payment [sic] of strike benefits are contingent upon members doing their share of picket duty.

[May 20, 1959] *The Picket Committee again warns that those who do not fulfill their picket duties until picketing officially ends will not receive strike benefits. * * *

The local guild's policy governing strike benefits which was adhered to and adopted by the Steering Committee provided, in part, as follows: "1. Any able-bodied person refusing to do picket duty will be denied strike benefits." Any able-bodied member of the local guild who failed to perform picket or other strike duties during the Globe strike would be refused strike benefits regardless of his lack of outside income.

The Globe strike terminated on May 27, 1959, and the members of the Globe unit returned to work.

On May 14, 1959, the executive committee of the local guild voted to sanction a strike of the Stereotypers Union No. 8 of the International Electrotypers and Stereotypers Union against the Pulitzer Publishing Co., St. Louis, Mo. The Stereotypers Union No. 8 is in nowise affiliated with the local guild. On June 9, 1959, Stereotypers Union No. 8 went on strike against the Pulitzer Publishing Co. Prior to the stereotypers' strike, the Globe had contracted with the Pulitzer Publishing Co. for the printing of the St. Louis Globe-Democrat in Pulitzer's plant. After the stereotypers' strike started, the executive committee of the local guild reaffirmed its strike sanction of May 14, 1959, and on June 12, 1959, the membership of the local guild endorsed the strike sanction. The stereotypers set up a picket line around the Pulitzer facilities. A resolution adopted by the general membership of the local guild "deplored the actions of a small minority of Guild members who crossed the picket line" and provided that "no benefit payments be made to members who crossed the picket line after June 12, 1959."

During the period of the stereotypers' strike, the ANG disbursed an additional amount of $25,000 from its international defense fund, which amount was added to the local guild's strike benefit fund.

At the commencement of the stereotypers' strike, a questionnaire captioned "Benefit Information" was distributed by the Welfare

Committee of the local guild to members of the Globe and Pulitzer units of the local guild. The questionnaire asked each member of the Globe and Pulitzer units whether he was married, whether his spouse was employed, the number of his unemployed children under 21 years of age, the number of other dependents with no pension or other income, whether there was any reason why he could not perform work for the guild if needed, the amount of his weekly salary if he was a part-time worker at the newspaper, whether he could obtain temporary work, and whether he had any outside income and the average amount thereof. Petitioner filled out the questionnaire and returned it to the local guild. Answers to questions contained in the "Benefit Information" questionnaire were applied to the aforementioned ANG schedule in order to determine the amount to be received by eligible members of the Globe and Pultizer units out of the strike benefit fund.

During the first week of the stereotypers' strike, the amount of the checks issued to eligible members of the Globe and Pulitzer units came from the local defense fund part of the strike benefit fund and was based upon the aforementioned ANG schedule. During the second week of the stereotypers' strike, the amount of the check issued to each of the eligible members of the Globe and Pulitzer units came from the international defense fund part of the strike benefit fund and also was based on the aforementioned ANG schedule.

At the end of each week, checks drawn on the strike benefit fund were made payable to each eligible member of the Globe and Pulitzer units. Each member of the Globe and Pulitzer units was required to come to either the local guild or Strike Headquarters and sign, after his typewritten name, the Strike Benefit Fund Report of the respective week in order to obtain his check. If said member was unable to appear, the check would be mailed out.

Petitioner did not cross the stereotypers' picket line and received checks in the amount of $15 in each of the weeks ended June 18, 1959, and June 24, 1959. Petitioner was not required to perform any strike duties during the 2-week period. However, it was his duty as well as the duty of every guild member not to cross the stereotypers' picket line.

During the period of the stereotypers' strike, bulletins and letters were issued to members of the Globe unit of the local guild notifying them of the requirement not to cross the stereotypers' picket line if they were to receive strike benefits. Anyone crossing the picket line would have been denied strike benefits. The reasons for not crossing the picket line were stated by the local guild in a bulletin dated June 15, 1959, as follows:

*The Guild and its members are the ones who will be gravely hurt!*

And they will be hurt where it hurts most—in the future pay they take home to their families, in the conditions under which they work * * *

The St. Louis Newspaper Guild is known for having among the best if not the best contracts in the American Newspaper Guild. They were won because the St. Louis Newspaper Guild is a strong union, which has won and held the support of fellow unionists in the plants and in the city.

Union members who are willing to take the benefits of this kind of cooperation but are unwilling to make the sacrifices that go along with it will not long have their benefits.

Without the co-operation of the other unions the Guild would soon become impotent to wage a successful strike by itself. By crossing the Stereotypers' picket line Guild members are contributing to the destruction of the Guild.

Those who are crossing the picket lines are hurting their union and themselves just as those who observe the picket lines are the union's strength.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Throughout the nation we have fought against such "efficient" practices as reporters carrying cameras, sports writers doing a turn on the news copy desk, etc., etc. The Guild will not long be able to continue to carry on these fights if those who urge the crossing of sanctioned picket lines were to prevail.

Why do managements want Guild members to report to work when there is no evidence at the bargaining table that a settlement is about to be reached?

We might as well face it. Even a management which is not diametrically opposed to the Guild would rather deal with a Guild which had lost the solid backing of organized labor.

Management is going to seek to operate effectively from its side of the bargaining table and give only what it feels it wants to give. Anything beyond that will be won only by a real union, backed by the support of other unions.

And a union weakened by the actions of its own members would become easy prey for a management determined to battle the Guild by all methods, as the Globe-Democrat management recently did. Adverse conditions by one employer soon will spread to another.

But the urgers say, "This strike is not against the Globe-Democrat. Why respect the line there?"

The stereotyping work of the Globe-Democrat will be done under the same contract as that done for the Post-Dispatch. Guild members should no more produce work at one newspaper than at the other when it is destined for a struck shop.

Despite our sympathy for any trade union in a sanctioned strike, this bulletin is not written on behalf of stereotypers and we think they understand that, too. Guild members will suffer just as much or more from a divided labor movement. Many stories are being spread to weaken the strike as were stories to weaken our recent strike. But what Guild members should carefully remember is to do nothing to weaken themselves.

The stereotypers' strike ended on June 25, 1959.

The following is a list of individuals who, at all times material hereto, have been members of the local guild and who did not receive weekly checks from the strike benefit fund of the local guild in any of the weeks of either the Globe or stereotypers' strike:

| | |
|---|---|
| George Carson | Marion O'Brien |
| Jane Connett | Muriel Ortbal |
| Wilhemina Hamman | Richard Terry |
| Pauline Koetting | Sylvia G. Wood |
| Elsie LeBegue | Tamako Yoshitake |
| Margaret Miller | |

Sylvia G. Wood, in answering her strike questionnaire, stated she had unusual financial problems in the form of "rent and contracted payments." However, she, as well as the other members on the list, did not receive weekly strike benefits. They were all listed as not having any record of strike work for the week ending March 3, 1959.

On March 5, 1959, during the Globe strike, the executive committee approved the establishment within the strike administrative fund of a strike loan fund in order to take care of emergency hardships of members of the Globe unit. The loan fund was administered by the Welfare Committee, at least three members of which would have to approve a request for a loan. If there was no agreement among the Welfare Committee members, the request would be referred to the Steering Committee. The loans were non-interest bearing and provided that repayment was to begin within 30 days after the borrower returned to regular employment.

During the period commencing April 17, 1959, and ending June 25, 1959, loans from the strike administrative fund in the total amount of $1,595 were made to 15 members of the local guild who were on strike during such period. The loans were evidenced by notes and were ultimately repaid by the respective guild members. The petitioner did not make any request for a loan, nor did he receive any loan from the strike administrative fund.

Employees of the Globe were covered by a group life insurance plan in which premium costs would be shared by payments from each employee and by the Globe. In March, April, and May of 1959 the employee's share of the premium cost was paid out of the strike administrative fund for members of the Globe unit. These payments were made on behalf of the members of the Globe unit.

Each member of the Globe unit was obligated to repay the amount of the premium cost paid by the local guild on his behalf. After the end of the Globe strike, each member of the Globe unit paid back to the local guild the total amount of the premium costs advanced for him. Premium payments were made on behalf of petitioner, and at the end of the Globe strike, petitioner repaid to the local guild the total amount of such premiums.

Petitioner and Helen did not include in gross income on their joint Federal income tax return for 1959 the amount of strike benefits received during the Globe and stereotypers' strikes. Respondent in his statutory notice of deficiency determined that the strike benefits received should have been included in their gross income.

#### ULTIMATE FINDING OF FACT

The strike benefits received by petitioner from the local guild during 1959 totaling $436.70 are includable in his gross income.

OPINION

Petitioner maintains that the strike benefits he received were gifts and as such were excludable from his gross income by virtue of section 102(a) of the Internal Revenue Code of 1954.[4] He relies heavily on the recent Supreme Court decision in *United States* v. *Kaiser*, 363 U.S. 299 (1960).

Respondent, on the other hand, contends that the strike benefits received by petitioner come within the category of gross income under section 61(a).[5] He further contends that under the facts of this case, the payments were not gifts and that the *Kaiser* case relied upon by petitioner is readily distinguishable from the instant case.

We agree with respondent.

The most critical consideration in determining whether the strike benefits received by petitioner were a gift is the intention of the transferor. *Bogardus* v. *Commissioner*, 302 U.S. 34, 43 (1937). If the benefits paid proceeded from a "detached and disinterested generosity," *Commissioner* v. *LoBue*, 351 U.S. 243, 246 (1956); or "out of affection, respect, admiration, charity or like impulses," *Robertson* v. *United States*, 343 U.S. 711, 714 (1952); then they constitute a gift within the meaning of the tax statute. The mere absence of a legal or moral obligation to make the payments in question does not establish that they are a gift. *Old Colony Tr. Co.* v. *Commissioner*, 279 U.S. 716, 730 (1929). Nor does the absence of a legal consideration for the payments make the benefits received a gift under the statute. *United States* v. *McCormick*, 67 F. 2d 867 (C.A. 2, 1933). However, if the payment does proceed from "the constraining force of any moral or legal duty" or from "the incentive of anticipated benefit of any kind," it is not a gift. *Bogardus* v. *Commissioner, supra*.

---

[4] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954.

SEC. 102. GIFTS AND INHERITANCES.

(a) GENERAL RULE.—Gross income does not include the value of property acquired by gift, bequest, devise, or inheritance.

[5] SEC. 61. GROSS INCOME DEFINED.

(a) GENERAL DEFINITION.—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

(1) Compensation for services, including fees, commissions, and similar items;
(2) Gross income derived from business;
(3) Gains derived from dealings in property;
(4) Interest;
(5) Rents;
(6) Royalties;
(7) Dividends;
(8) Alimony and separate maintenance payments;
(9) Annuities;
(10) Income from life insurance and endowment contracts;
(11) Pensions;
(12) Income from discharge of indebtedness;
(13) Distributive share of partnership gross income;
(14) Income in respect of a decedent; and
(15) Income from an interest in an estate or trust.

Furthermore, the Supreme Court, as well as this Court, has stated that exemptions to gross income, having been specifically stated, should be construed with restraint. *Commissioner* v. *Jacobson*, 336 U.S. 28 (1949); *Publishers New Press, Inc.*, 42 T.C. 396, 400 (1964); *Heard* v. *Commissioner*, 326 F. 2d 962 (C.A. 8, 1964), affirming 40 T.C. 7 (1963), certiorari denied 377 U.S. 978 (1964). The question we must decide here is primarily a factual one. *Commissioner* v. *Duberstein*, 363 U.S. 278, 290 (1960); *Smith* v. *Commissioner*, 305 F. 2d 778 (C.A. 3, 1962), affirming a Memorandum Opinion of this Court, certiorari denied 371 U.S. 208 (1962). In this regard the Supreme Court stated in *Commissioner* v. *Duberstein, supra* at 289:

Decision of the issue presented in these cases must be based ultimately on the application of the fact-finding tribunal's experience with the mainsprings of human conduct to the totality of the facts of each case. The nontechnical nature of the statutory standard, the close relationship of it to the data of practical human experience, and the multiplicity of relevant factual elements, with their various combinations, creating the necessity of ascribing the proper force to each, confirm us in our conclusion that primary weight in this area must be given to the conclusions of the trier of fact. * * *

In light of the aforestated legal principles regarding what is a gift within the meaning of section 102, we are of the opinion that, under the facts of this case, the strike benefits received by petitioner were not gifts. We have purposely set forth the facts of this case in detail and at great length. On the record before us, the payments to petitioner by the local guild and the ANG were not motivated by the latter's "affection, respect, admiration" or "charity" for the petitioner. Nor did the payments proceed from a "detached and disinterested generosity." The payments were made by a labor union of which petitioner was a member in good standing. The aim and purpose of the ANG was "to advance the economic interests of its members." That payments of this nature were contemplated is self-evident when one reads both the constitution of the ANG and the bylaws of the local guild. Numerous articles and sections of the ANG's constitution, set forth in our Findings of Fact, deal exclusively with strikes and the establishing of defense funds utilized to support strikes. While we are not prepared to state that the ANG and local guild were under a legal obligation to make the payments in question, we are of the opinion that they were under a strong moral obligation to do so. This fact alone is sufficient to prevent the payments from constituting gifts under the tax statute. *Commissioner* v. *Duberstein, supra* at 285. However, we do not rest our decision solely on this ground. We are convinced, further, that the petitioner in this case was also morally, if not legally, bound to do certain acts in order to be eligible for the strike payments. Petitioner was a man in good physical condition and was required to perform necessary strike duties before he could be considered eligible for strike benefits. This was made clear by the

ANG in its policy letters set forth in our Findings of Fact. Furthermore, the numerous Strike Bulletins issued by the local guild and the minutes of the Steering Committee of the local guild clearly show a strong policy not to make any payments to able-bodied members who did not perform strike duties. Moreover, the executive secretary of the local guild testified unequivocally that no benefits were to be paid to any able-bodied member who did not perform his share of the necessary strike duties, such as picketing. Although it was true that during the stereotypers' strike members of petitioner's local were not required to perform any active duties, they were informed by the local guild that a crossing of the picket line set up by the stereotypers would be grounds for withholding any strike benefits. Therefore, petitioner was morally obligated to refrain from crossing the picket line and by so doing he was performing a service to his union and incidentally to himself. Cf. *Salvage* v. *Helvering*, 76 F. 2d 112, 113 (C.A. 2, 1935), reversing a Memorandum Opinion of this Court, affd. 297 U.S. 106 (1936). Furthermore, the local guild made it clear that the main purpose of observing the picket line was to further the economic future of the union and its members. In view of the above, we are convinced that the motivating force behind the payments here involved proceeded from the anticipation of economic benefit both to the local guild and to the petitioner. *Bogardus* v. *Commissioner, supra*. Through the force and power of a strike the local guild intended to benefit its members by securing additional job security. Strike benefits were paid to members of the local guild, including petitioner, to enable them to continue with the strike so that the aims of the ANG could be accomplished. In our opinion, this does not amount to a gift. *Commissionner* v. *Duberstein, supra.*

In reaching our conclusion that the benefits received were not gifts we are not attempting to determine the true character of the payments. *Frank J. Matula, Jr.*, 40 T.C. 914, 919 (1963). Whether the payments received were compensation for services rendered, compensation for refraining from performing services, or any other form of income, the tax consequences to petitioner are the same. We are of the opinion that the term "gross income" as defined by this Court, *Frank J. Matula, Jr., supra; Clarence R. Williams*, 35 T.C. 685 (1961); as well as the Supreme Court, *Commissioner* v. *Glenshaw Glass Co.*, 348 U.S. 426 (1955), is broad enough to include within its boundaries strike benefits received by this petitioner. *Heard* v. *Commissioner, supra*. Cf. concurring opinion of Mr. Justice Frankfurter, *United States* v. *Kaiser, supra* at 305–325.

The only reported cases we could find involving strike benefits are *United States* v. *Kaiser, supra*, and *Godwin* v. *United States*, —— F. Supp. —— (W.D. Tenn. 1964). And, as we stated previously, petitioner has built his entire case around the *Kaiser* decision. The re-

sult we reach here, although contrary to the result reached in *Kaiser*, is, nevertheless, entirely consistent with the rules laid down in *Kaiser*. The Supreme Court stated therein that the question should be left to the trier of the facts. In this instance we conclude for the reasons stated above that the strike benefits received by this petitioner were not gifts.

The Supreme Court in *Kaiser* pointed to the following facts which they felt must have influenced the jury in reaching the verdict it did: The taxpayer was not a union member at the time the strike was called; however, he voluntarily and without any moral obligation went on strike also; it was the policy of the union to grant assistance to the many Kohler strikers simply on a need basis; it was not necessary to be a union member to receive benefits; the union did not require, advise, or encourage strikers who were receiving benefits to picket or perform other strike duties; in determining the need of a striker, the union would inquire into a striker's financial resources including net worth; the taxpayer had no means of current income nor any financial resources; and the other forms of public assistance were not available to the taxpayer.

The facts herein are materially different from the facts in *Kaiser*. Here petitioner was a union member at all times. The evidence of record clearly indicates assistance was not rendered to or available for nonunion members. Petitioner was required to perform strike duties before he would be eligible for strike benefits. This was the stated policy of the ANG and the local guild, which policy was adhered to. Whether petitioner was in actual need of assistance is, to say the least, doubtful. The local guild did not even inquire into petitioner's resources. All they did was to inquire into his marital status and the number of dependents he had. While this did affect the amount of benefits he received, we are of the opinion that his needs were not the prime motivating force behind the payments. *Commissioner* v. *Duberstein*, *supra* at 286.

The *Godwin* case held as a matter of law that the payments made by an airline pilot union to a striking pilot were includable in the latter's gross income. The trial judge, although well aware of the language of the Supreme Court in both *Duberstein* and *Kaiser*, that whether an item is a gift or income is a question of fact, felt that since there were no indicia of a gift present, he was not warranted in submitting the case to the jury. While the instant case does not present as strong a factual situation indicating that the strike benefits received were income as do the facts in *Godwin*, nevertheless, we feel and have found as a *matter of fact* that the benefits received herein were income and not gifts.

We have made our factual findings based upon legal guidelines established by the Supreme Court and conclude that the strike bene-

fits received by this petitioner and under the circumstances of this case were not gifts as that term is used in the tax statute. Having thus found, we must decide this issue in favor of respondent. Whether strike benefits paid by a union to its members can ever be a gift need not be decided by us at this time. Cf. Rev. Rul. 61–136, 1961–2 C.B. 20; dissenting opinion in *United States* v. *Kaiser, supra* at 327–334; and *Godwin* v. *United States, supra.* We only decide in this case that the strike benefits received by petitioner from the local guild and ANG were not gifts.

Petitioner maintains that the Internal Revenue Service is not proceeding against other taxpayers although their factual circumstances are similar to his. Although petitioner does not so state, we presume that he is arguing that he is being denied equal treatment and that he is being discriminated against contrary to the Constitution of the United States. Suffice for us to say that the facts of record do not support his blanket assertions. *Heard* v. *Commissioner, supra* at 967. Cf. *United States* v. *Kaiser, supra* at 314.

*Decision will be entered under Rule 50.*