Mabel Phillips, an Individual, and Mabel Phillips, Surviving Spouse of Clifton D. Phillips, et al. [1] v. Commissioner. Phillips v. Commissioner
Docket Nos. 1361-63 - 1364-63.
United States Tax Court
T.C. Memo 1965-268; 1965 Tax Ct. Memo LEXIS 64; 24 T.C.M. (CCH) 1457; T.C.M. (RIA) 65268; October 5, 1965
Bernard Shevach, for the petitioners. John D. Picco and Eli Blumenfeld, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: The Commissioner determined deficiencies in petitioners' income taxes as follows: Docket
Taxable
Defi-
No.
Petitioner
Year
ciency
1361-63
Mabel Phillips, an indi-
vidual, and Mabel
Phillips, surviving
spouse of Clifton D.
Phillips
1960
$ 713.10
1362-63
Eugene K. Wootten and
Virginia L. Wootten
1960
454.01
1363-63
Harley D. Flesvig and
Eleanor C. Flesvig
1960
992.89
1961
861.46
1364-63
Raymond W. Erickson
and Ella A. Erick-
son
1960
$ 857.02
1961
1,162.35 The only issue for decision is whether strike benefits received by petitioners during the years in issue are includable *67 in their gross income. Findings of Fact Some of the facts have been stipulated, are so found, and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Clifton D. Phillips (hereinafter referred to as Phillips) and Mabel Phillips were husband and wife during 1960. They filed their joint Federal income tax return for said year with the district director of internal revenue for the District of Oregon. Phillips is now deceased, and Mabel Phillips, as surviving spouse of Phillips, and Mabel Phillips, individually, are the petitioners in Docket No. 1361-63. Petitioners Eugene K. Wootten (hereinafter referred to as Wootten) and Virginia L. Wootten are husband and wife. They filed their joint Federal income tax return for the year 1960 with the district director of internal revenue for the District of Oregon. Petitioners Harley D. Flesvig (hereinafter referred to as Flesvig) and Eleanor C. Flesvig are husband and wife. They filed their joint Federal income tax returns for the years 1960 and 1961 with the district director of internal revenue for the District of Oregon. Petitioners Raymond W. Erickson (hereinafter referred *68 to as Erickson) and Ella A. Erickson are husband and wife. They filed their joint Federal income tax returns for the taxable years 1960 and 1961 with the district director of internal revenue for the District of Oregon. Phillips, Wootten, Flesvig, and Erickson will sometimes hereinafter be referred to collectively as petitioners. Petitioners were members of the Stereotypers' and Electrotypers' International Union, Local No. 48 (hereinafter referred to as International Union and Local Union). At the time of the strike, Flesvig was president of Local No. 48. Petitioners were journeymen stereotypers. Other members of the Union included apprentices, as well as other journeymen stereotypers. The members of the Local Union were formerly employed by the Oregonian Publishing Company or the Journal Publishing Company, publishers of two daily and Sunday newspapers in Portland, Oregon, (hereinafter referred to as the Oregonian and the Journal). Members of the Stereotypers' and Electrotypers' Union performed the job of casting metal cylinders which, when locked into place on the presses, print the news, pictures, editorials, and advertising content of the newspaper. At the time of the *69 strike 29 members of the Local Union were employed by the Oregonian and 27 by the Journal. The dispute between the Local Union and the two newspapers related to hourly wage rates, certain fringe benefits, and the following: Whether foremen had to belong to the Local Union; whether other employees who had already worked 35 hours a week were to be paid overtime wages when replacing absent employees; and whether the newspapers had the right to designate the number of operators on new machines. The Local Union and the newspapers sought to negotiate their differences with a series of conferences which were unsuccessful. On or about November 3, 1959, the Local Union called a meeting and the membership voted to strike against the newspapers. Petitioners attended the meeting and voted in favor of the strike. Thereafter on November 3, 1959, both the Local Union and the International Union authorized a strike against the two newspapers. The strike was commenced by the Local Union on November 10, 1959, when pickets were placed at all entrances occupied by the two newspapers. Other craft union members employed by the two newspapers such as the Newspaper Guild, typographical workers, mailers, *70 web pressmen, paper handlers, machinists, teamsters, engravers, linotypers, and others refused to cross the picket lines. About 600 employees of the two newspapers were affected. The Oregonian and the Journal continued publication by operating the presses through the use of executive personnel and trained employees employed from other sections of the country. At the time of the strike, the Journal was owned by local interests and the Oregonian by the Sam Newhouse Newspaper organization. Since that time the Newhouse interests have also acquired ownership of the Journal. The strike started on November 10, 1959, and continued for an extended period of time. It was not successful and by the end of 1964 the Local Union was no longer active. Strike benefits were stopped entirely in November of 1964. The International Union is the parent organization having supervision and control over the subordinate local unions. The International Convention is the supreme authority of the International Union. Between conventions the business affairs of the International Union are administered by the International Executive Board (hereinafter referred to as IEB). The IEB consists of International *71 officers elected by referendum vote, namely, a president, secretary-treasurer, and three vice-presidents. The purpose of the International Union, as stated in its constitution, is as follows: It is the purpose of the International Union that local unions, through the process of negotiation and conciliation, may secure contracts with employers that recognize certain basic conditions for the welfare of the local members, and for the general good of members of the Internation Union * * *. Local Union No. 48 was organized under a charter granted by the International Union. It is governed by a constitution and bylaws which, among other things, incorporate "all sections of Constitution and General Laws" of the International Union. Upon admission to the Local Union each member pledges himself to the following obligation: OBLIGATION I (give name) sincerely promise to guard the business of this union; I will honestly abide by the constitution, by-laws, adopted scale of wages, and decisions of the majority. I will use every endeavor to procure employment for members of the International Stereotypers' and Electrotypers' Union in preference to others; I will not subordinate my duty to *72 the union in behalf of any other society or combination; I will not wrong a brother member or see him wronged if in my power to prevent; I further promise not to work in any shop or plant in which a strike or lockout has been fully authorized by the International Executive Board, unless given permission by the Executive Board; to all of which I hereby pledge my honor. The Executive Board of the Local Union consists of a president, vice-president, secretary-treasurer, and two members elected by the Union. The Pacific Slope Conference Mutual Aid Pact (hereinafter referred to as Slope) is a third labor organization operating in the Pacific area. This organization is an affiliation of local unions in the western States, whose primary purpose is to provide auxiliary funds in the case of strikes or other emergencies. A principal officer of Slope is its secretary-treasurer who along with the president and vice-president of participating local unions comprise the Finance Committee of Slope. The Finance Committee is obligated to establish an adequate bookkeeping system and to maintain a bank account in the name of the Defense Fund of Slope. The pertinent provisions of the International *73 constitution relating to the financing and conduct of strikes are as follows: ARTICLE XI Defense Fund Sec. 11. There shall be a special fund to be known as the Defense Fund. All money derived from any assessment, the disposition of which is not specifically provided for, shall be credited to the Defense Fund. As provided in Article XI, Section 3, ten cents (10") per month of the journeyman per capita tax shall be credited to the Defense Fund. ARTICLE XII Strike Benefits Sec. 14. When a strike has been inaugurated under the provisions of Sections 134 and 135 General Laws, the International Executive Board shall pay to the order of the president and secretary of the union involved, for a period of eight weeks or longer, at its discretion, an amount equal to $70.00 per week for each per capita tax paying journeyman and associate member, and $47.50 per week for each registered apprentice entitled thereto. Members on strike or lockout who receive casual employment at the trade in other offices shall have one-fifth of the strike or lock-out benefit deducted for each day of employment. Whenever members who have received strike or lock-out benefits from the International Union, *74 and then receive full compensation from the employers for lost time as the result of a ruling by an arbiter, court, or other authority, the local union shall reimburse the International Union for the amount extended to the members of the local union in the form of strike or lock-out benefits. When the amount of the award or settlement does not equal the members' full weekly wage, reimbursement to the International Union shall be all surplus monies in excess of the members' weekly wage as per contract including said award and the strike benefits received from the International Union. At no time shall the payments by the International Union exceed $70.00 per week for journeymen and associate members, or $47.50 per week for each registered apprentice entitled thereto. Requirements to Qualify Sec. 14A. No member of a local union on strike shall be entitled to the weekly benefit unless he reports daily to the proper officers of the local union while the strike continues. No member receiving four days' work in any week shall receive benefits for that week; and no member receiving four weeks' continuous work shall have his name again restored to the list of those entitled to benefits *75 except with the approval of the International Executive Board. Any member refusing work while out on strike shall be debarred from all benefits under this law. The pertinent provisions of the International general laws relating to the financing and conduct of strikes are as follows: STRIKES AND LOCKOUTS Procedure to Inaugurate Sec. 134. In the event of a disagreement between a local union and an employer, which, in the opinion of the local union, may result in a strike, such union shall notify the International President, who shall repair in person or by proxy to the place where said union is located, and confer with the officials of said local, investigate the cause of the disagreement, and endeavor to adjust the difficulty. If his efforts should prove futile, he shall notify the Executive Board of all the circumstances, and if a majority of said Board shall decide that a strike is necessary, said union may be authorized to order a strike; and it is imperatively ordered that no strike or lockout shall be deemed legal, or moneys expended from the Defense Fund on that account, unless the strike or lockout shall have been authorized or recognized by the Executive Board. *76 * * *
Benefits Sec. 138. When a strike has been authorized by the International Executive Board, or if a lockout or layoff has been forced on a local union, due to a labor dispute within the jurisdiction of the local union, strike, lockout and layoff benefits shall be paid in accordance with Sections 14 and 14A of Article XII. No Benefits Without Strike Sanction Sec. 139. Any local union inaugurating a strike without the approval of the International Executive Board shall receive no benefits on account of said strike. * * * Benefits Are For Members Involved And To Prosecute Strike Sec. 140. All moneys received by a local union from the International Executive Board shall be used only in supporting men on a strike or lockout, in assisting their removal to other cities, and for prosecuting strikes in such manner as the union interested and the International Executive Board shall deem necessary. * * *
May Refuse Cards If One-Third of Members Involved Sec. 142. When there shall have been a strike ordered in accordance with the laws of the International Union, all union men shall be deemed to have been notified and required to assist and take part. * * * The pertinent *77 provisions of the constitution and by-laws of Local Union are as follows: ARTICLE XI Sec. 79. All sections of Constitution and Genera, Laws of the International Stereotypers' and Electrotypers' Union applicable to subordinate unions shall be deemed a part of these local laws and shall be as binding upon members of this Union as if they were incorporated herein. * * *
ARTICLE XIII Sec. 105. Any Union inaugurating a strike without the approval of the Executive Board shall receive no benefits on account of said strike. * * *
Sec. 107. When there shall have been a strike ordered in accordance with the laws of the International Union, all union men shall be deemed to have been notified and required to assist and take part. * * * The pertinent provisions of the Mutual Aid Pact by-laws of Slope concerning strikes and strike benefits are in part as follows: ARTICLE I SECTION 1 - Any member of the I.S. & E.U. in good standing whose local or M.A.L. Chapel is a member of the Pacific Slope Conference and is a party to this Agreement, who loses his employment due to a strike action authorized by the Executive Board of the I.S. & E.U. shall be eligible to receive auxiliary *78 strike benefits in addition to those provided by the International, in a manner provided for in following sections * * * SECTION 3 - Requirements to Qualify: Requirements to qualify shall be governed by Article XII, Section 14-A, page 52 of the I.S. & E.U. Constitution * * * Local Union was required to pay to the International Union a per capita tax of $2.50 per month for each journeyman member in good standing. Of that amount, 10" was allocated by the International Union to a "Defense Fund" to be disbursed in accordance with applicable provisions of the constitution and general laws to assist the various locals in the event of a strike or other emergency. Local Union paid the International Union a per capita tax of $1.50 per month for apprentice members in good standing but no part of this was placed in the "Defense Fund." The Local Union dues for a journeyman stereotyper member before and during the strike was 1 percent of his gross earnings per week. Dues for apprentice members in good standing during the same period was 1/2 of 1 percent of gross earnings per week. Petitioners were members of Local Union in good standing in November 1959 and during the progress of *79 the strike. Petitioners were current in the payment of dues and assessments levied by the Local and International Unions. They qualified for strike benefits under the constitution and laws of the International and Local Unions and received strike benefits in the amounts indicated in the statutory notices of deficiency. The funds disbursed to petitioners and other striking members of Local Union as strike benefits in the taxable years were funneled through Local Union and came from three separate sources: (1) International Union
(2) Slope (3) Other contributing unions and individuals The maximum basic weekly strike benefits contributed by International, Slope, and other contributing unions and individuals through Local Union to each union member who qualified were as follows: Source of Funds
Journeyman
Apprentice
International Union
$70.00
$47.50
Slope
15.00
7.50
Other contributing unions
and individuals
15.00
30.00
$100.00
$85.00
During the taxable years petitioners qualified for and received strike benefits from the International Union, Local Union, and Slope, as follows: 1960
1961
Phillips
$5,295
Erickson
5,295
$5,900
Flesvig
5,295
5,849
Wootten
3,295
*80 Petitioners were journeymen stereotypers, and the strike benefits paid to each for a full week of qualification was $100. In 1960 petitioners Phillips, Erickson, and Flesvig received one over-all weekly benefit of $95 and 52 weekly benefits of $100 each, or $5,295 for the year. Petitioner Wootten accepted employment in August 1960 and received no strike benefits thereafter. Petitioners Erickson and Flesvig continued to receive strike benefits in 1961. The income tax returns of petitioners for the taxable year 1960 disclosed the following information: Item
Phillips
Erickson
Flesvig
Wootten
Salary - husband
None
$ 382.50
$ 425.50
$2,560.62
Salary - wife
None
1,615.48
1,198.36
None
Dividends
None
78.28
None
None
Interest
None
43.65
None
None
Strike benefits reported
None
None
None
None
Adjusted gross income
None
$2,119.91
$1,622.86
$2,560.62
Exemptions
2
4
2
5
The income tax returns of petitioners Erickson and Flesvig for the taxable year 1961 disclosed the following information: Item
Erickson
Flesvig
Salary - husband
$ 25.95
$ 275.53
Salary - wife
3,732.50
1,296.98
Dividends
72.18
None
Interest
83.00
None
Strike benefits reported
None
None
Adjusted gross income
$3,913.63
$1,572.51
Exemptions
4
4
*81 Petitioner Erickson had two dependent children, petitioner Flesvig had two dependent children, and petitioner Wootten had three dependent children. Prior to the strike, a journeyman stereotyper received an hourly rate of $3.61, or $126.35 for a 35-hour week. On this basis, disregarding overtime or premium pay for working more than 35 hours per week, he received annual gross earnings of $6,569.20. To receive strike benefits a stereotyper on strike was required to be a member of the union and to "sign in" daily at strike headquarters. The amount of the strike benefit depended on the classification of the particular member as a journeyman, probationary journeyman, or apprentice. The amount of the strike benefit was not affected by his marital status, number of dependents, or financial condition. There was no obligation to submit a questionnaire relating to actual need of the recipient. A union member was not entitled to strike benefits if he failed to report daily to strike headquarters without excuse or if he was not current in the payment of dues. Petitioners and other members of the Local Union assisted in the maintenance of picket lines and engaged in door-to-door canvassing *82 of residents to encourage them to cancel their subscriptions to the Oregonian and Journal. The picketing operations and the "Cancel Your Subscription Drive" were well organized campaigns maintained on a daily basis during the entire 4 1/2 to 5 years of the strike. The picket lines were established and supervised by Local Union. Picketing details were controlled by a picket chairman, picketing assignments were posted to bulletin boards, and a picketing section was set up at strike headquarters with appropriate racks, rain jackets and signs. The "Cancel Your Subscription" campaign was planned and supervised by the Local Union and involved the services of over 300 people divided into teams assigned to the various sections of the city. The Stereotypers Union also supplied stereotypers at the request of the Portland Reporter discussed infra during the strike and assisted with the delivery and distribution of the Portland Reporter. Occasionally during the strike a petitioner or other member of the Local Union would receive casual employment. Pursuant to Article XII, section 14A of the International constitution, and Article IV, section 2 of Slope, whenever such employment occurred, *83 the Local Union deducted one-fifth of the member's weekly strike benefits for each day of such employment. Except on occasions when excused, each petitioner reported daily to strike headquarters and his name was placed on the list of union members eligible to receive weekly strike checks. The name of each petitioner and the amount of strike benefits payable to him were typed on the strike benefit fund statement. Each petitioner appeared at strike headquarters each week, signed his name to the strike benefit fund statement, and received his check. In 1960 strike benefits were paid to as many as 56 members of the Stereotypers' Union. The number of recipients diminished gradually for the first two years of the strike and steadily thereafter. In 1962 the outlook for successful termination of the strike was not good and conditions worsened during that year. In June 1962 the International Union and Slope stopped strike benefits indefinitely. Local Union continued to pay strike benefits, but the number of recipients was reduced to 25. In 1963 Local Union stopped payments for three months. At the same time the International Union and Slope temporarily resumed strike benefits with payments *84 going to from a maximum of 13 members to a minimum of 3 members. This unstable condition prevailed until November 1964, when payment of strike benefits was completely terminated from all sources. None of petitioners applied for public welfare assistance from Multnomah County or the State of Oregon in the taxable years or during the progress of the strike. Petitioners were not eligible for general welfare assistance under the prevailing policies of the county and State welfare departments which denied such assistance to strikers. In 1961 approximately 225 striking employees of the Journal filed claims with the Oregon Department of Employment for unemployment compensation benefits between the period from November 7, 1959, to February 4, 1961. On February 6, 1961, a referee for the Department of Employment conducted an administrative hearing attended by counsel for the claimants and the employer. On June 23, 1961, the referee entered his decision against the claimants. He relied for support on Oregon Revised Statutes, section 657.200, which provides that "an individual is disqualified for benefits for any week with respect to which the Commissioner finds that his unemployment is due *85 to a labor dispute which is in active progress * * *" An appeal was taken to the Appeals Board of the State Department of Employment where the referee's findings were upheld on July 21, 1961, on the same ground. After the newspaper strike started, members of the labor unions involved in the newspaper strike caused a weekly newspaper operating under the name of the "Portland Reporter" to be organized. It became an independent daily newspaper competing with the Journal and the Oregonian on February 11, 1960. Most of the personnel operating the Portland Reporter were former employees of the Oregonian and the Journal out on strike. The Portland Reporter was strictly a labor union paper until February 11, 1961. As a weekly it identified itself as "the official publication of the Portland Inter-Union Newspaper Committee," consisting of representatives of the unions involved in the strike. In its first issue as a newspaper on February 11, 1960, the Portland Reporter announced the following policy statement: This is the first issue of a new weekly newspaper sponsored by the unions whose members are on strike or observing strike picket lines at the plants of The Oregonian and the Oregon *86 Journal. * * *
This publication is not the forerunner of a third daily newspaper for Portland. It is planned to exist only until the day an honorable accord is reached in the present dispute - a day all of us hope will be soon arriving. The question whether working on the Portland Reporter during the strike represented a desirable strike activity was discussed at a Local Union meeting and no official expression for or against the activity was recorded. Neither the executive board of the Local Union nor the IEB took an official position prohibiting union members from working on the Portland Reporter without pay or compensation during the strike. Petitioners and other members of the union furnished stereotyping and other services to the Portland Reporter without pay or compensation during the period of the strike. While so engaged, such members qualified for and received strike benefits. The Portland Reporter during February 1961 expanded its operations and formally became an independent newspaper competing with the other Oregon papers. However, it had a short life and ceased operation in September 1964. Article XII, section 14A, of the International constitution was amended *87 on February 1, 1964, by adding the words "and fulfills his strike assignments" in the first sentence thereof, so that thereafter it read as follows: No member of a local union on strike shall be entitled to the weekly benefit unless he reports daily to the proper officers of the local union and fulfills his strike assignments while the strike continues * * * Each petitioner and his wife did not include in gross income on their joint Federal income tax returns for 1960 and 1961, as the case may be, the amount of strike benefits received during the strike. Respondent determined in his statutory notices of deficiency that strike benefits in the following amounts received by petitioners should have been included in gross income: Docket No.
Petitioners
Year
Amount
1361-63
Phillips
1960
$5,295
1362-63
Wootten
1960
3,295
1363-63
Flesvig
1960
5,295
1961
5,849
1364-63
Erickson
1960
5,295
1961
5,900
Ultimate Fact The strike benefits received by each petitioner from Local Union during 1960 and/or 1961 in the amounts set forth above are includable in his gross income. Opinion Respondent contends that the strike benefits received *88 by each petitioner during the years in issue constitutes gross income subject to tax under section 61(a), Internal Revenue Code of 1954. [2] Although petitioners did not file any written briefs with this Court, it is apparent that they are maintaining that the strike benefits do not constitute gross income, but, are "gifts" excludable from the category of gross income by section 102(a). We presume they rely heavily upon the Supreme Court case of United States v. Kaiser, 363 U.S. 299 (1960). We agree with respondent. The question of whether strike benefits received by a union member while on strike constitute gross income has recently been decided by this Court. In John N. Hagar, 43 T.C. 468 (1965), this Court found, on facts almost identical with those of the instant case, that as a matter of fact, strike benefits received by the taxpayer therein constituted gross income and were not gifts. As in John N. Hagar, supra, we are led to our conclusion herein by the fact that the strike payments were paid only to members of *89 the union in good standing; that the strike payments were in no way related to the financial needs of the union members nor was any attempt made by the union to determine which members were actually in financial need; that the strike payments were substantial in comparison to the actual salary of the union members; that the union was at least morally obligated to make the payments according to its constitution and by-laws; and that the union members were at least morally obligated to partake in the strike and render their services to the furtherance of the aims of the strike. The facts herein easily distinguish this case from United States v. Kaiser, supra. See John N. Hagar, supra, at 486. Accordingly, we follow John N. Hagar, supra, and hold that the strike benefits received by each petitioner herein during the years in issue constitute gross income subject to tax. Decisions will be entered for the respondent. Footnotes
1. Proceedings of the following petitioners are consolidated herewith. Eugene K. Wootten and Virginia L. Wootten, Docket No. 1362-63; Harley D. Flesvig and Eleanor C. Flesvig, Docket No. 1363-63; and Raymond W. Erickson and Ella A. Erickson, Docket No. 1364-63.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954.↩