**David R. HALSOR and Patricia A. Halsor, Plaintiffs,**

v.

**George O. LETHERT, District Director of Internal Revenue, Defendant.**

No. 3–64–Civ. 79.

United States District Court
D. Minnesota,
Third Division.

Thomas M. Vogt and David E. Kelby, of Felhaber, Larson & Fenlon, St. Paul, Minn., for plaintiff taxpayers.

John G. Milano and Daniel Dinan, Tax Division, Department of Justice, Washington, D. C., for defendant.

LARSON, District Judge.

The above entitled matter is an action by plaintiffs for the recovery of income taxes said to be wrongfully assessed by defendant in the calendar years 1960 and 1961.

The Court heard testimony on January 20, 1965. The Court has considered the testimony and the arguments and briefs of counsel.

The only issue is whether amounts paid to plaintiff David R. Halsor (taxpayer) by the Air Line Pilots Association (ALPA) during 1960 and 1961 were excludable from gross income as gifts under 26 U.S.C. § 102.[1]

Prior law makes it clear that whether particular payments are gifts or income depends on the facts of each case. Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960) and United States v. Kaiser, 363 U.S. 299, 80 S.Ct. 1204, 4 L.Ed.2d 1233 (1960). But Duberstein points out that the critical consideration is always "the intention with which payment, however voluntary, has been made."[2]

During 1960 Northwest Airlines, Inc., (the Company) began to acquire pure

---

1. Section 102 of the Internal Revenue Code of 1954, 26 U.S.C. § 102 (1958) provides:

"(a) *General rule.*—Gross income does not include the value of property acquired by gift * * *."

2. 363 U.S. 286, 80 S.Ct. 1197.

jet aircraft. There was a dispute at the time between flight engineers, represented by the International Association of Machinists (IAM), and pilots, represented by ALPA, as to what the crew complement on a jet aircraft should be.

As a result of this dispute the flight engineers in October, 1960, refused to fly on pure jet aircraft and these twenty planes had to be grounded. About 140 pilots, including the taxpayer, were laid off during the next six weeks.[3] The taxpayer did not return to work until June, 1961.

Taxpayer and other pilots discussed their need for financial aid with local officers of ALPA and on November 16, 1960, the ALPA Board of Directors adopted the following resolution:

"WHEREAS there exists on Northwest Airlines a dispute between the carrier and another labor organization arising from the implementation of ALPA Policy by the pilots of Northwest Airlines, and

"WHEREAS Northwest Airlines has furloughed a group of pilots due to this dispute,

"THEREFORE BE IT RESOLVED that the pilots furloughed due to the dispute arising from implementation of ALPA Policy be covered by the Benefit Policy of the Air Line Pilots Association, and

"BE IT FURTHER RESOLVED that the Board of Directors approve benefits for these affected pilots."

The ALPA Policy Manual sets out the relevant terms of the benefit policy involved as follows:

"SECTION XIII
"STRIKE POLICY
"BENEFIT AND ASSESSMENT POLICY
"PART I
"SCOPE OF BENEFIT POLICY

"A.   The Board of Directors shall be balloted for payment of benefits to pilots deprived of air line income due to:

"1.   Being involved in processing a properly authorized strike; or

"2.   A furlough or lock-out by management arising directly out of the efforts of the Association group to resolve a dispute;  or

"3.   As a result of a group of members or the Association implementing ALPA policy.

"C.   No benefits shall be paid during any work stoppage or shutdown not covered by A and B above. * *

"PART II
"AMOUNT AND ADMINISTRATION OF BENEFITS

*   *   *   *   *   *

"E.   Benefits shall be paid according to the following schedule, subject to the provisions of paragraph J of this Part. (This schedule is based on a formula of 1/365 of 50 per cent of the previous year's income, as verified, adjusted to $1,000 brackets, with a minimum of $11.70 per day, and a maximum of $18.33 per day):

| SALARY BRACKET | DAILY BENEFIT RATE |
|---|---|
| Up to . . . . $4,000.00 | $11.70 |
| $4,000.01 to      5,000.00 | 11.70 |
| *   *   *   *   *   * | *  *  * |
| 15,000.01 and above | 18.33 |
| *   *   *   *   * | |

3.   The Company may have laid off more pilots than the grounding of those twenty planes required in order to cut its payroll. The ALPA apparently never considered this possibility in voting benefit payments. Since only the intent of the ALPA is crucial, this point may be disregarded as having no effect on it.

"The daily rates set forth in the above table are fixed amounts not subject to rebate for any reason other than mistake in payment and not subject to setoff against other earnings except for earnings from approved activity with the affected carrier during the shutdown. * *

"I. Apprentice members and non-members who cooperate in the effort may receive benefits . . ..

"PART III
"ASSESSMENT POLICY

"A. Assessments will be levied for each major benefit program on a pay-as-you-go basis. * * *"

Payments were made to the taxpayer in accordance with the terms of the benefit policy until he returned to work in June, 1961.

In brief, the pilots laid off by Northwest were out of work as a result of the dispute between the ALPA and the IAM. Many of them might have been recalled to work if the ALPA had been willing to concede on the issue of the crew complement in pure jet aircraft. The ALPA decided that it was appropriate to make payments to them under the benefit and assessment provisions of its strike policy. The Court believes that, under these circumstances, the payments were not gifts.

The terms of the policy show that ALPA only pays benefits to pilots whose unemployment is in some way caused by and furthers association objectives. The membership has certainly not consented to be assessed for any purely gratuitous donation which the Board of Directors may be inclined to vote.

The fact that the taxpayer was not on strike is irrelevant. The ALPA benefit policy recognizes that there are situations other than strikes in which the same moral and practical considerations behind strike benefits are present. The ALPA decided that this was such a situation and made the payments. Its motive is the same as it would have been if a strike were involved. Members of the ALPA are encouraged and enabled to support its policies.

Since the Court has determined from the facts and the terms of the benefit policy that the ALPA did not make these payments with anything like the "detached and disinterested generosity" which is the requisite of a gift under § 102, there is no point in discussing the other respects in which this case is different from one like Kaiser.[4]

The foregoing constitute Findings of Fact and Conclusions of Law within Rule 52 of the Rules of Civil Procedure.

## ORDER FOR JUDGMENT

Judgment will be entered for the defendant.

---

4. Kaiser is not directly in point because it only involves the extent to which particular payments can be held income or gifts as a matter of law. This Court has only a question of fact for resolution.

However, to the extent that comparisons are of interest, the first five distinctions given by the Court in Godwin v. United States, 65-1 U.S.Tax Cas. para. 9121 (W.D.Tenn.1964) are relevant.