George Jernigan and Hattie Mae Jernigan v. Commissioner.
Jernigan v. Commissioner
Docket No. 1005-66.
United States Tax Court
T.C. Memo 1968-18; 1968 Tax Ct. Memo LEXIS 279; 27 T.C.M. (CCH) 95; T.C.M. (RIA) 68018; January 29, 1968. Filed Lewis R. Donelson, III and Maurice Wexler, Suite 2020, First Nat'l Bank Bldg., Memphis, Tenn., for the petitioners. Charles G. Barnett, for the respondent. TANNENWALD
Memorandum Opinion TANNENWALD, Judge: Respondent determined deficiencies in the Federal income tax of petitioners for the taxable years ending December 31, 1962 and December 31, 1963 in the respective amounts of $473.51 and $757.52. After certain concessions by the respondent, three issues remain for our consideration: (1) Whether petitioners can exclude from their 1962 and 1963 taxable income payments received as strike benefits from both the international and local union; (2) the extent to which petitioners are entitled to a business deduction for certain automobile expenses; and (3) whether petitioners must include in their gross income an amount *280 received as reimbursement for travel expenses in connection with jury duty performed during 1963. Some of the facts have been stipulated and are found accordingly. Petitioners, George Jernigan and Hattie Mae Jernigan, are husband and wife and resided in Memphis, Tennessee, at the time the petition herein was filed. For the taxable years ended December 31, 1962 and December 31, 1963, petitioners filed timely joint Federal income tax returns with the district director of internal revenue, Nashville, Tennessee. Hereinafter, "petitioner" will refer only to George Jernigan, Hattie Mae Jernigan being a party to this proceeding only by reason of her having filed a joint return with her husband. 96 For some time prior to April 23, 1962, petitioner was employed by Braswell Motor Freight Lines, Inc. (hereinafter referred to as "Braswell") in Memphis, Tennessee. At all times relevant herein, he was a member of both the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (hereinafter referred to as the "International") and Local 667 of the International. Local 667, headquartered in Memphis, was the recognized collective bargaining representative for *281 employees of Braswell as well as for a number of persons employed by several other business entities. On or about April 23, 1962, the employees of Braswell, including petitioner, pursuant to a vote by the membership of Local 667, commenced a lawful strike to obtain continued recognition of Local 667 as their authorized bargaining representative. The strike vote was authorized by the bylaws of the local union and the constitution of the International. At the time of such strike, there were approximately 2,500 members in Local 667, employed by approximately 45 companies, all of which had operative signed contracts with Local 667 except Braswell and Bowman Freight Lines (hereinafter referred to as "Bowman"). Between 25 and 30 union members employed by Braswell, together with some non-union employees, participated in the strike. At the commencement of the Braswell strike, petitioner, as a member of the International, became eligible for strike benefits according to the provisions of the International constitution, subject only to a waiting period of one week. Such benefits amounted to $15 per week for the first four weekly payments and $25 per week thereafter. Because he was unemployed *282 as a result of being on strike, petitioner was not eligible for state unemployment compensation. On or about February 18, 1962, the members of Local 667 adopted a program of financial assistance for those members of the local who were then on strike against Bowman. At this time, a strike by Local 667 against Braswell was anticipated and the assistance was intended to extend to all members who would cease working for Braswell as a result of such upcoming strike. Such program was not created pursuant to any written directive or mandate of either the bylaws of the local or the constitution of the International, and its continuance was in no way guaranteed, being wholly subject to the action of the membership of Local 667. Prior to the adoption of this program, there had been no organized method by which members of the local who were on strike might receive financial assistance in addition to that rendered by the International. Additional assistance was typically dependent upon individual solicitation and collections made on an informal basis among the members themselves. Because this random and informal system of local aid had proved unsatisfactory, considerable thought had been given *283 to various alternatives for providing local assistance, including the distribution of benefits in the form of grocery "chits" or credits and the payment of aid in varying amounts on a basis of financial need. These alternatives were rejected in view of the administrative and investigative burden which they would place on Local 667. The program adopted by the membership of Local 667 provided for benefits of $35 weekly in addition to the International strike benefits and assessed "each member $2.00 per month as long as any members of Local 667 are on strike." Neither Local 667 nor International benefits were payable to anyone who refused to work for any company having a valid and existing agreement with the International. Such benefits were also to be reduced on a substantially prorata basis for compensation received from any employment. (In the case of the International, such reduction was to occur only after the employee received three or more days' pay in any week.) Under the governing rules of both the International and Local 667, disciplinary action, such as suspension and loss of membership rights and privileges, could be taken against members for nonpayment of dues, fines, *284 assessments, etc. The $2 monthly charge has been collected, for the most part, by means of the local's check-off - i.e., deducted, along with union dues, by the employer from the wages of the particular member. Some members have paid the monthly charge in cash at the offices of Local 667. Practically all of the striking employees of Braswell, including petitioner, performed picket duty on a regular basis, although they were technically under no legal obligation to do so. None of the striking members were permanently excused from picket duty, although members were occasionally 97 excused temporarily because of deaths, illnesses, or important personal business. No striking member, including petitioner, ever failed to do picket duty without giving what was considered a valid reason for such refusal. The weekly local strike benefits were increased, by Local 667 membership action, to $55 per week in September 1963 and to $75 per week in March 1964, in recognition of the fact that financial pressures upon strikers had to be alleviated to at least some extent in order to keep them on the picket line and also because more funds were available upon termination of the Bowman strike. *285 During all times relevant herein, there was no increase in the strike benefits paid to the Braswell employees, including petitioner, by the International. During the taxable year 1962, petitioner received $1,897.72 in wages from Braswell, $603.07 from part-time employment, and strike benefits of $835 from the International and $1,280 from Local 667. During the taxable year 1963, petitioner received $3,550.42 from part-time employment and strike benefits of $1,300 from the International and $2,105 from Local 667. Petitioner did not include any of the strike benefits in his gross income. During 1962 and 1963, petitioners owned and operated a retail business in Memphis known as the Bargain Center - engaged principally in the retail sale of both new and used lower-priced clothing. During these years, petitioner used his automobile in the ordinary course of operating the business to the extent of 35 to 40 miles per week, primarily for the purpose of picking up merchandise from different locations in Memphis and bringing it to the store. In both 1962 and 1963, petitioner deducted $320 for "Auto Expenses." Respondent allowed $104 for 1962 and $130 for 1963. Petitioner expended $250 in *286 each year for automobile expenses connected with the operations of the Bargain Center. In 1963, petitioner served for 13 days as a juror during the September term of the Circuit Court of Shelby County and was paid daily mileage at the rate of 10 cents per mile to cover the cost of operating his automobile to and from his home and the Shelby County Court House. Petitioner did not include the $7.80 he received in his gross income. [1]
The principal issue before us is whether the strike benefits received by petitioner in 1962 and 1963 constitute income to him in those years. We think the previously decided cases in the strike benefit area control our decision herein (see infra, p. 10), and, despite petitioners' detailed analysis, we again decline "to cut our way through the thicket of subjective and occasionally ephemeral concepts with which the decided ["gift"] cases bristle." See Jordon Perlmutter, 45 T.C. 311, 317 (1965). Essentially, petitioner's position is that we need not, and, therefore, should not, categorize these strike benefits as income. In effect, *287 he asks us to reach the same factual judgment as did the jury whose verdict was affirmed in United States v. Kaiser, 363 U.S. 299 (1960), namely, that the strike benefits were gifts. We are unable to do so. Certain facts herein stand out. Although there were minor differences in the foundation for the International and Local 667 benefits and the procedures by which they were established, both types of benefits derived from authorized action of the respective unions. [2] We are satisfied that the benefits were authorized and paid to promote the economic interests of the members as well as the status of the unions as the authorized representatives of the trucking industry, in the case of the International, and of the Braswell employees, in the case of Local 667. No attempt was made to relate the amount of benefits paid to the needs of the strikers. The benefits were authorized prior to the commencement of the Braswell strike and no doubt in some degree influenced the Braswell employees to agree to take strike action. Petitioner's receipt of strike benefits was conditioned upon his retaining "good standing" as a union member. In this connection, it is not without significance *288 that benefits were payable only to striking members. Although not legally required to do so, petitioner was obviously at least under some moral 98 compulsion to picket and he did in fact continuously participate, with minor exceptions, in the picket line. Moreover, he was clearly under at least a moral obligation not to cross the picket line, and it also appears that he would have forfeited his benefits if he had interfered with the strike activities. Finally, petitioner received substantial cash payments which he was free to do with as he pleased. [3]
*289 Under all of the foregoing circumstances and on the basis of the entire record herein, we are satisfied that the strike benefits received by petitioner were not "gifts." We see no significant distinctions between the facts of this case and those previously decided cases which have held that certain strike benefits are includable in gross income. Woody v. United States, 368 F. 2d 668 (C.A. 9, 1966); Halsor v. Lethert, 240 F. Supp. 738 (D. Minn. 1965); Godwin v. United States, an unreported case, ( D. Tenn. 1964, 15 A.F.T.R. 2d 253); William A. Brown, 47 T.C. 399 (1967), on appeal (C.A. 6, May 22, 1967); John N. Hagar, 43 T.C. 468 (1965). With respect to the automobile expenses, we have found that petitioner used his automobile for business purposes. While the record is not wholly satisfactory, we have made an estimate, as best we can, of the expenses which petitioner thereby incurred and paid. Accordingly, we hold that, to the extent of $250 in each of the taxable years 1962 and 1963, he is entitled to a deduction under section 162 of the Internal Revenue Code of 1954. The mileage fees in connection *290 with jury duty (which were obviously reasonable in amount) represented reimbursement for the costs to petitioner of temporary performance of a non-personal legal obligation as a citizen. In a sense, it can be said that the reimbursement was for expenses incurred to facilitate the proper functioning of the judiciary and to enable the government to discharge its responsibilities. As such, we think that they were not commuting expenses and are properly excludable from gross income. Cf. Rev. Rul. 60-280, 1960-2 C.B. 12, and Rev. Rul. 57-60, 1957-1 C.B. 25 (reimbursement by a board of education for transporting children to school). In order to reflect concessions of the parties, Decision will be entered under Rule 50. Footnotes
1. Petitioner did include $52 in his income for 1963 representing the statutory jury fee at $4 per day.↩
2. With respect to the Local 667 program, even if we were to accept petitioners' argument that we should look behind the official union procedure, we would find it hard to attribute a "detached and disinterested generosity" to the actions of the individual members. Each member most likely paid his monthly charge with the thought that, "If I scratch his back, he'll scratch mine. - i.e., "If I pay to help others on strike, they'll pay to help me when I'm on strike." Cf. Commissioner v. Duberstein, 363 U.S. 278↩ (1960). 3. Petitioner received wages and strike benefits in the total acounts of approximately $4,600 in 1962 and $7,000 in 1963, as compared with his approximately $5,500 annual rate of earnings from Braswell at the time of the strike. We also note that, on the record herein, it does not appear that petitioner's strike benefits were reduced to reflect his earnings from part-time employment as provided in the authorization to pay strike benefits.↩