MADONNA J. AND JAMES E. COLWELL, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 342-73.     Filed July 17, 1975.

James E. Colwell, pro se.
*Edward B. Simpson,* for the respondent.

FORRESTER, *Judge:* Respondent has determined a deficiency in petitioners' income tax for the year 1970 in the amount of $1,164.12. The sole issue presented for our decision is whether certain benefits paid to James E. Colwell during a strike against his employer constitute gifts within the meaning of section 102(a)[1] and are therefore excludable from petitioners' gross income.

---

[1] All statutory references are to the Internal Revenue Code of 1954, unless otherwise specified.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioners James E. and Madonna J. Colwell are husband and wife who resided at Petaluma, Calif., at the time the petition was filed. Petitioners filed their 1970 joint income tax return on a calendar year basis.

Throughout 1970, James E. Colwell (hereinafter sometimes referred to as Colwell) was employed as a stereotyper by the Independent Journal (Journal), a daily newspaper publisher located in San Rafael, Calif. In 1970 Colwell was a member of the International Stereotypers and Electrographers Union Local Number 29 (ISEU), a craft union.

On January 3, 1970, the International Typographical Union (ITU), also a craft union, and its Local Number 21 called a strike of its members against the Journal. The strike lasted throughout 1970 and was in effect for a period of time thereafter.

At no time was Colwell a member of the ITU, and the ISEU and the ITU are not affiliated. No union other than the ITU called a strike against the Journal.

On the morning of January 3, 1970, the ITU established a picket line at the Journal's premises. When Colwell reported to work that morning, he refused to cross the picket line and, at all times thereafter, he continued to honor the picket line. Approximately 70 employees of the Journal who were not members of the ITU honored the picket line. Colwell did not perform any work for the Journal during the strike. Notwithstanding the strike, the Journal continued its business and published its daily newspaper during 1970.

The ITU paid Colwell a total of $5,264.58. The payments were made weekly to Colwell and other employees of the Journal who were not members of the ITU and who signed cards identifying themselves as being out of work and without income due to the strike. Payments were not subject to any restrictions in use or to any conditions such as participation in the picket line, and no strike duties were required.

The ITU did not inquire into the petitioners' financial condition or personal need. Payments to Colwell were calculated according to an ITU schedule of members' strike benefits on a weekly, five shifts per week, basis to a maximum of 60 percent of a journeyman's wage.

The only condition to which payments were subject was that the recipient had to report any earnings to the ITU Local 21. Colwell received approximately $22.50 for each shift that he did not work. Every shift that he worked he lost one-fifth of the weekly ITU payment.

Colwell attempted to work as a substitute stereotyper elsewhere in the San Francisco area during 1970, and so earned approximately $3,500 from five different employers. In 1969 Colwell's salary at the Journal was approximately $5 per hour and he worked a 35-hour week.

Petitioners' adjusted gross income in 1970, exclusive of payments made by ITU, was $12,757. Petitioners did not include in their 1970 income any part of the $5,264.58 in payments received from the ITU. In 1971, Colwell began work full time with a new employer in Santa Rosa, Calif.

As an ultimate finding of fact, we find that the ITU payments to Colwell in 1970 were not gifts.

### OPINION

The sole issue before us is whether the ITU payments to Colwell are excludable from petitioners' 1970 gross income as gifts under section 102(a). This is purely a factual determination. *Commissioner v. Duberstein,* 363 U.S. 278 (1960); *United States v. Kaiser,* 363 U.S. 299 (1960).

Whether a transfer qualifies as a gift for income tax purposes depends upon the intent of the transferor. *Commissioner v. Duberstein, supra* at 285; *William A. Brown,* 47 T.C. 399, 407 (1967), affd. per curiam 398 F. 2d 832 (6th Cir. 1968). The transferor's characterization of the transfer is not determinative, rather it is the factfinder's responsibility to make objective inquiry into the circumstances surrounding the transfer to discover if the transfer proceeds from a "detached and disinterested generosity" on the transferor's part. *Bogardus v. Commissioner,* 302 U.S. 34, 40 (1937); *Commissioner v. LoBue,* 351 U.S. 243, 246 (1956); *William A. Brown, supra.*

Petitioners rely almost exclusively on *United States v. Kaiser, supra,* in which the Supreme Court refused to overturn a jury finding that certain strike benefits in the form of food vouchers and rent payments given to a nonunion worker who was unemployed and without income because of the union's strike qualified as gifts excludable from gross income under section

102(a). *Kaiser* is a companion case to *Commissioner v. Duberstein, supra.* In our opinion, *Kaiser* stands only for the proposition that the determination of whether a transfer is a gift for income tax purposes is uniquely within the province of the factfinder. See *Woody v. United States,* 368 F. 2d 668, 670-671 (9th Cir. 1966). Nevertheless, we recognize, as the Court of Appeals for the Second Circuit has so aptly stated, that the Supreme Court's *Duberstein* and companion opinions do not mean "that every trier of the facts [is] free for all future time to disregard guidelines that other trial and appellate courts [have] developed concerning the weight to be given to recurring 'relevant factual elements, with their various combinations.' " *Estate of Carter v. Commissioner,* 453 F. 2d 61, 64 (2d Cir. 1971), revg. a Memorandum Opinion of this Court.

There are several cases in which this Court and others have decided the exact issue before us now. Although each case was decided on its own facts, a review of those cases reveals the salient factual elements on which those decisions have turned. Among these elements are the following: whether the union calling the strike was under a moral or legal obligation to make the payments; whether the payments were made upon a consideration of the recipient's financial status and need, and as a corollary, whether the benefits continued during the strike regardless of whether the recipient worked elsewhere; whether the recipient was a member of the striking union; whether the payments required the recipient to perform any strike duties such as picketing, and if not, whether or to what extent the recipient was under a moral obligation to participate in such strike activities; and finally, whether any restrictions were placed on the use of the payments, particularly in regard to whether the benefits were restricted to payment of basic necessities such as food and shelter or whether the recipient had unfettered control over use of the funds. E.g., *Kaiser v. United States, supra; Woody v. United States, supra; William A. Brown, supra; John N. Hagar,* 43 T.C. 468 (1965).[2]

In the instant case, we have weighed all of the above factual elements, a number of which are favorable to petitioners. Colwell was not a member of the striking ITU which paid him the

---

[2] Other cases include *George Jernigan,* T.C. Memo. 1968-18; *Godwin v. United States,* an unreported case (W.D. Tenn. 1964, 15 AFTR 2d 258, 65-1 USTC par. 9121); *Halsor v. Lethert,* 240 F. Supp. 738 (D. Minn. 1965).

benefits, and Colwell's union did not call a strike. He was not required to, nor did he, participate in any strike activities. The ITU's payments to Colwell were strictly related to the number of shifts per week that he did not work. When Colwell did work, then, irrespective of where or for whom he worked, his benefits were reduced accordingly.

Nevertheless, in helping us to determine what motivated the ITU to provide the benefits, we rely heavily on the lack of awareness of, or even any inquiry into, the petitioners' financial status on the part of the ITU.

Respondent concedes that a gift excludable under section 102(a) can be made to persons without the slightest financial need. However, he argues and we agree, that in the case involving union strike benefits paid to a striking worker who is not a member of the striking union, it must be shown at the outset that the union first inquired into the recipient's financial status and found him in need, in order for the payments to be excludable under section 102(a). This is necessarily so because strike benefits inherently are designed to meet economic need arising only because of the strike. They are paid precisely to help those unemployed by a strike, not from charitable impulse, but from the self-interested desire to ensure the economic feasibility of the strike. Thus, unless the union makes inquiry into the personal needs of the recipient and makes its payments according to that need, it is impossible to distinguish any benefits as being paid primarily out of a detached and disinterested generosity or other charitable impulse rather than from the desire to ensure the effectiveness of the strike. See dissenting opinion of Justice Whittaker in *Kaiser v. United States, supra* at 326.

Of course, such a showing will not ipso facto prove that the motive was detached and disinterested generosity. However, we feel such a showing is a required minimum; without it, we cannot say, as the Supreme Court was able to say in *Kaiser v. United States, supra* at 304:

[The factfinder] had the power to conclude, on the record, taking into account such factors as * * * the conditions of personal need, of lack of other sources of income, compensation or public assistance, and of dependency status, which surrounded the program under which it was rendered, that while the assistance was furnished only to strikers, it was not a recompense for striking. * * *

The president of the ITU Local 21 during the strike testified at trial that the benefits were paid solely as relief. This is not

sufficient to establish that the ITU's primary intent was detached and disinterested generosity. It seems to us that if the union is wholly unaware of the recipient's financial status and yet it makes regular payments to those honoring the picket line, calculated as a percentage of wages according to employee position, as in the instant case, then the union's intent is not charitable, but is to further the economic feasance, and hence, effectiveness of the strike.

We also think it is significant that petitioners were unrestricted in their use of the ITU payments. The benefits could as well have paid for an extended vacation as to have paid for rent or other basic needs. This surely reflects upon the union's self-interest in making the payments. *William A. Brown, supra* at 409.

Respondent also points to petitioners' adjusted gross income during the time Colwell received the ITU payments. He argues that the petitioners' income of $12,757 is a clear indication that petitioners had no need for the ITU payments. We disagree. The record is barren of evidence of petitioners' total liabilities, and without such, like the union, we cannot say that petitioners did or did not need the payments.

On the record before us, we must find that the ITU made the payments to promote the success of the strike. We cannot say that the benefits proceeded from charity or other generous impulse. Consequently, they are not excludable from petitioners' 1970 income under section 102(a).

*Decision will be entered for the respondent.*