JERRY S. PLACKO, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8612–78.    Filed May 28, 1980.

Jerry S. Placko, pro se.
*Martha E. Rist,* for the respondent.

WILES, *Judge:* Respondent determined a deficiency of $2,010 in petitioner's 1976 Federal income tax. The sole issue is whether payments received by petitioner from the Northwest Airlines Master Executive Council of the Air Line Pilots Association

during 1976 were excludable from gross income as gifts under section 102.[1]

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner Jerry S. Placko and Linda A. Placko, husband and wife, timely filed a joint Federal income tax return for 1976. They resided at Richfield, Minn., when petitioner timely filed his petition in this case.

During 1975 and 1976, petitioner was employed as a pilot by Northwest Airlines, Inc. (hereinafter Northwest), from January 1, 1975, through September 24, 1975, and from May 10, 1976, through December 31, 1976. During the intervening period from September 24, 1975, through May 10, 1976, petitioner was laid off by Northwest. During the periods petitioner was employed by Northwest, he was a member of the Air Line Pilots Association (hereinafter ALPA) as were all pilots employed by Northwest. ALPA, a national union representing the interests of airline pilots, is based in Washington, D.C., and has a local branch, Northwest Airlines Master Executive Council (hereinafter NWA-MEC) located in Bloomington, Minn.

The pilots employed by Northwest engaged in a 3-day strike against Northwest from August 10, 1975, through August 13, 1975. ALPA called the strike after a favorable balloting of its membership by NWA-MEC. The NWA-MEC, with the concurrence of the president of ALPA, is empowered to call a strike only if a majority of the ballots are cast in favor of a strike.

Prior to the strike of August 1975, Donald Nyrop, the president of Northwest, stated that 25 pilots would be laid off if the strike were called. On August 30, 1975, Northwest issued layoff notices to 25 pilots including petitioner, effective October 1, 1975. ALPA perceived the layoff of 25 pilots by Northwest as a vindictive act by management due to the strike. Negotiations between Northwest and ALPA have often resulted in strikes prior to the resolution of disputes or mutual acceptance of contracts.

---

[1]Statutory references are to the Internal Revenue Code of 1954 as amended.

At a meeting held on or about December 3, 1975, the NWA-MEC unanimously adopted Resolution 75–41, which stated:

WHEREAS the layoff of 25 pilots of NWA was a vindictive act for the pilot strike of August, 1975, and

WHEREAS the strike was for the benefit of all pilots on NWA,

THEREFORE BE IT RESOLVED that the NWA pilot membership of ALPA be balloted as to whether or not the MEC should levy an assessment to provide a benefit levy of $950 per month to the 25 furloughed pilots, such benefits to be for a period from November 15, 1975, through May 15, 1976.

The Agenda for this meeting contained the following discussion of proposed Resolution 75–41:

It is apparent that the furlough of 25 pilots in October and November was a vindictive act by NWA management for our three day strike in August. Efforts to prevent this lay-off proved unsuccessful and it appears that a speedy resolution of the problem at the System Board level is also impossible. This brings up the question of what further steps the Association can take to ease the hardships that these 25 individuals are having to bare [sic] because of the action the entire NWA pilot group took.

By letter, the NWA-MEC notified the membership of Resolution 75–41 and solicited ballots on whether it should be adopted.

In January 1976, a majority of the membership of NWA-MEC voting on Resolution 75–41 approved an assessment of $15 per month for 6 months against each pilot working for Northwest. These assessments were collected from each pilot then working for Northwest by NWA-MEC and were placed in a separate bank account.

Amounts collected pursuant to Resolution 75–41 were disbursed by NWA-MEC to each of the laid off pilots who had not been recalled to work by Northwest, in equal monthly installments, through May 1976. The disbursements were made by means of checks drawn on the separate bank account established for that purpose. Under the terms of Resolution 75–41, petitioner received $5,153.92 during 1976 from NWA-MEC.

In determining the amounts to be paid to each laid off pilot, the NWA-MEC did not inquire as to the financial need, financial status, number of dependents, fixed expenses, or other sources of income of the individual laid off pilot. The only funds held by ALPA or the NWA-MEC, or which were under their control during 1975 and 1976, were received from its members through dues or assessments.

Petitioner did not include the $5,153.92 he received from

NWA-MEC in his gross income for 1976. He did, however, file with his 1976 return a note informing the Commissioner that he had received such amount as a gift due to being laid off by Northwest. In the notice of deficiency, respondent claimed that the amount received from NWA-MEC during 1976 was not excludable from petitioner's gross income.

## OPINION

The sole issue is whether payments received by petitioner from NWA-MEC during 1976 were excludable from gross income as gifts under section 102.

Petitioner argues that these payments are excludable because they were gifts from the working pilots to the 25 pilots, including himself, who were laid off by Northwest. He claims, as we understand his argument, that NWA-MEC was merely a conduit for the gifts from the working pilots. Respondent argues that petitioner must include these amounts in his gross income for 1976. He maintains that the payments did not constitute a gift in that the primary motive of the transferor NWA-MEC was to benefit ALPA rather than from a feeling of detached and disinterested generosity toward petitioner.

Section 61(a) states that gross income includes all income from whatever source derived unless excludable by a specific provision of the Code. Section 102(a) provides, in part, that gross income does not include the value of property acquired by gift.

Whether a transfer qualifies as a gift for income tax purposes depends upon the intent of the transferor. *Commissioner v. Duberstein*, 363 U.S. 278, 285 (1960); *Colwell v. Commissioner*, 64 T.C. 584, 586 (1975). Determining such intent requires an objective inquiry into the circumstances surrounding the transfer rather than relying on the transferor's characterization of the transfer. *Commissioner v. Duberstein, supra* at 285; *Bogardus v. Commissioner*, 302 U.S. 34, 43 (1937). The circumstances surrounding the transfer must demonstrate a "detached and disinterested generosity" on the part of the transferor. *Commissioner v. Duberstein, supra* at 285; *Commissioner v. LoBue*, 351 U.S. 243, 246 (1956); *Brown v. Commissioner*, 47 T.C. 399, 408 (1967), affd. per curiam 398 F.2d 832 (6th Cir. 1968).

Generally, payments made by unions as a result of a strike are not treated as gifts if the payments are calculated without regard to financial need or are made with no restrictions on use.

*Colwell v. Commissioner, supra; Brown v. Commissioner, supra;* cf. *Kaiser v. United States,* 363 U.S. 299 (1960). Payments received by an airline pilot from a union following the pilot's layoff due to a dispute between such union and another union have been found to be includable in the pilot's gross income rather than excludable as gifts. *Halsor v. Lethert,* 240 F. Supp. 738 (D. Minn. 1965). Whether a monetary payment is treated as a gift for tax purposes is an issue of fact for determination on a case by case basis. *Commissioner v. Duberstein, supra* at 290; *Kaiser v. Commissioner, supra* at 304.

In the instant case, the payments were made by NWA-MEC to 25 of its members who had been laid off as a result of a union-called strike. These layoffs had been threatened by management prior to the strike in an apparent attempt to avoid the work stoppage. When the pilots did in fact engage in a 3-day strike, management carried out its threat by laying off 25 pilots. Petitioner was one of the pilots laid off from September 24, 1975, through May 10, 1976, as a result of the dispute. As the petitioner testified, Donald Nyrop, president of Northwest, was "trying to blackmail the union before the strike."

On the basis of these facts, we are unable to find the payments made by NWA-MEC were a result of "detached and disinterested generosity." The payments aided NWA-MEC and ALPA in maintaining their effectiveness as a bargaining agent in negotiations with Northwest and in overcoming the chilling effects of the retaliatory action by Northwest's management as perceived by the union. See *Halsor v. Lethert, supra* at 740. Resolution 75-41, and the payments made to the laid off pilots under its terms, demonstrated to the pilots laid off as a result of union action that they would not be abandoned by the union. Given the history of labor disputes between the union and Northwest culminating in strikes, the payments were no doubt helpful in maintaining the strong support of the union's members necessary to withstand threats and layoffs by management.

We recognize that NWA-MEC was not required to make the payments to petitioner and other laid off pilots. The mere absence of a legal or moral obligation, however, is inadequate to establish that the payment was a gift under section 102. *Commissioner v. Duberstein, supra* at 285. The NWA-MEC, nonetheless, apparently did feel something akin to a moral obligation to provide financial assistance to the laid off pilots, as

the discussion of Resolution 75–41 notes that the laid off pilots were bearing hardships because of the action taken by the Northwest pilot group.

Furthermore, in similar cases involving strike benefits, this Court has emphasized that the payments in question were made without regard to financial need and other sources of income, and without any restrictions as to use. See *Colwell v. Commissioner, supra; Brown v. Commissioner, supra*. Although the payments in the instant case clearly were not strike benefits, we believe those factors are relevant here in considering all the facts and circumstances for determining whether the payments qualify as gifts.

The NWA-MEC made no attempt to determine the financial status of the laid off pilots. The pilots each received the same monthly benefit so long as they did not return to work at Northwest, regardless of any other income or employment they obtained. No restrictions were placed on the use of the funds by the recipients. While this failure to inquire into petitioner's need is not dispositive of the issue, it further indicates that NWA-MEC did not make the payments out of detached and disinterested generosity. See *Colwell v. Commissioner, supra; Brown v. Commissioner, supra*.

Petitioner asserts that the payments were received from the working pilots of Northwest, apparently suggesting that NWA-MEC was a mere conduit for the payments. We do not agree. Although Resolution 75–41 was adopted by a majority vote of the working pilots, all the working pilots were assessed $15 per month for 6 months, regardless if they were in favor of the resolution. The individual pilots involved were bound by the decision of the NWA-MEC, which was based on a majority vote of its members. The NWA-MEC drafted and proposed the resolution to the pilots, arranged for the balloting of the pilots on the resolution, and implemented the resolution by collecting the funds at issue and making payments to petitioner and 24 other laid off pilots. Clearly, the payments were received by petitioner not from individuals, but rather from a union of which he was a member.

For these reasons, we hold that the payments received by petitioner from NWA-MEC during 1976 were includable in his gross income in that year rather than excludable as gifts under

section 102. We have considered petitioner's other arguments and find them unpersuasive.

To reflect the foregoing,

*Decision will be entered for the respondent.*