RICHARD A. OSBORNE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; PETER L. DAWSON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Osborne v. Commissioner
Docket Nos. 8455-93, 14846-93
United States Tax Court
T.C. Memo 1995-71; 1995 Tax Ct. Memo LEXIS 72; 69 T.C.M. (CCH) 1895; February 14, 1995, Filed *72 Decision will be entered under Rule 155 in docket No. 8455-93. Decision will be entered for respondent in docket No. 14846-93. P1 and P2 were airline pilots who participated in a secondary strike called by ALPA, the pilots union. P1 was a member of ALPA, but P2 was not. ALPA, pursuant to its procedural rules, authorized the payment of strike benefits to striking pilots. ALPA assessed its membership to fund the benefits, and it paid out equal amounts of benefits to all striking pilots, regardless of each pilot's rank, union standing, or financial need. P1 and P2 each received strike benefits from ALPA. Held: Strike benefits constitute taxable income to P1 and P2. For petitioner in docket No. 8455-93: F. Brook Voght, J. Bradford Anwyll, Kevin L. Kenworthy, and Michael E. Baillif. For petitioner in docket No. 14846-93: Janet Altman Spragens, Andrew J. Weinstein (specially recognized), and David P. Korteling (specially recognized).
For respondent: Leonard T. Provenzale. POWELL
POWELL
MEMORANDUM FINDINGS OF FACT AND OPINION POWELL, Special Trial Judge: These consolidated cases were assigned pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183. *73 [1]
By notice of deficiency dated February 5, 1993, respondent determined a deficiency in petitioner Richard A. Osborne's (Osborne) 1989 Federal income tax in the amount of $ 5,299 and additions to tax pursuant to sections 6653(a)(1) and 6662(a) and(d). In her answer, respondent asserted an addition to tax pursuant to section 6662(c). By notice of deficiency dated April 9, 1993, respondent determined a deficiency in petitioner Peter L. Dawson's (Dawson) 1989 Federal income tax in the amount of $ 5,573. Osborne resided in Hialeah, Florida, and Dawson resided in Alexandria, Virginia, when they filed their timely petitions. After concessions by respondent, [2] the sole issue is whether petitioners may exclude from gross income, as nontaxable gifts, strike benefits disbursed by the Air Line Pilots Association International (ALPA). *74 These are two of a number of potential cases that involve payments of strike benefits received by Eastern Airline pilots during 1989 and 1990. Following trial and briefing, these cases were consolidated for purposes of opinion. The facts may be summarized as follows. FINDINGS OF FACT Petitioners were pilots for Eastern Airlines (Eastern) during 1989. Eastern had been acquired in 1986 by Texas Air Corp. (Texas Air), a holding company owned by Frank Lorenzo (Lorenzo). Under Lorenzo's stewardship as chief executive officer, the relationship between management and the pilots was, at best, strained. The pilots' view of the matter was as follows: Eastern was systematically stripped of several safety features in an effort to turn a quick profit for Texas Air and Lorenzo. Eastern's state-of-the-art weather division was sold, replacing a 40-member staff of trained forecasters with a computer. Spare parts *75 were sold off. Necessary maintenance was delayed in order to keep airplanes in the air. Pilots were pressured to fly airplanes they believed unsafe. Federal Aviation Administration (FAA) regulations were skirted. Mandated inspections were not performed. Pilots experienced an increase in life-threatening "black box" emergencies, including the explosion of an engine on takeoff. The pilots, becoming increasingly concerned about the deterioration of safety, implemented the "Max Safety" program, which instructed pilots to make their own inspections of the airplanes and to doublecheck the actions of maintenance personnel. The pilots also felt that Lorenzo jeopardized Eastern's financial security in the following manner: Eastern sold its computerized reservation system to another Texas Air subsidiary for a long-term, low-interest $ 100 million note, and then leased it back for $ 100 million a year. Eastern entered into a gasoline supply arrangement with another Texas Air corporation, which added a penny-per-gallon surcharge on gasoline it sold. Eastern paid monthly so-called management fees of $ 500,000 to Texas Air. Also, under Lorenzo's management Eastern sold many profitable *76 operations, including its Miami/London route, the Kansas City hub, the Eastern Shuttle, and several gate leases at Newark Airport. Many of these actions benefited Continental Airlines, another Texas Air subsidiary. On March 4, 1989, the International Association of Machinists and Aerospace Workers (IAM) declared a strike against Eastern. On the same day, Eastern pilots began a "sympathy", or "secondary", strike against Eastern in support of the IAM. Dawson participated in some picketing activities at Washington National Airport, and Osborne performed some picketing and other strike activities in Miami and some other locations. Neither pilot flew for Eastern during the strike. The pilots strike was called by the master executive council (MEC) representing Eastern pilots for ALPA, a union representing pilots for almost all of the major commercial carriers in the United States. The administrative structure of ALPA consists of a board of directors, an executive committee, an executive board, MEC's, and local executive councils (LEC's). The board of directors, the highest governing body of ALPA, is composed of high officials from each of the lower organizational components. It *77 is vested with the general management and conduct of ALPA's business affairs. The executive committee and the executive board implement the policies announced by the board of directors. An MEC is formed for each airline represented by ALPA, and it functions as a coordinating council for the membership of that airline. LEC's are established for each MEC in cities with high concentrations of the airline's pilots. Section 65 of ALPA's Administrative Manual (the Manual) sets out union policy on strike benefits and assessments: A. SCOPE OF BENEFIT POLICY
1. The President shall ballot the Board of Directors for authority to pay benefits and to levy an assessment, if necessary, for those benefits to flight deck crew members deprived of airline income due to: a. Being involved in processing a properly authorized strike * * *. * * * 2. Approval of this authority shall require a two-thirds (2/3) majority of the valid ballots returned. * * * Benefits shall be paid from the Major Contingency Fund * * *. 3. The entire Active Membership in Good Standing may be balloted by secret ballot under ALPA Voting Procedures with a majority of the valid ballots returned required *78 for authority to levy an assessment and pay benefits to flight deck crew members deprived of airline income due to reasons other than those outlined in Paragraph A.1 above, such as: a. The establishment of picket lines by other crafts or classes of airline employees who are on strike, and after the President's Department shall have furnished the MEC of the airline involved sufficient facts to enable the MEC to make a decision whether or not they wish to honor said picket lines. * * * 4. The decision to ballot the entire Active Membership in the above circumstances will be made by the Executive Committee and only in such cases where there exists considerations of grave importance to the welfare of the entire Association or of emergency nature affecting the welfare of members of ALPA. The costs of the benefits under this paragraph shall be paid solely from membership assessments. 5. No benefits shall be paid during any work stoppage or shutdown which have not been approved under A.2 or A.3 above. * * * B. AMOUNT AND ADMINISTRATION OF BENEFITS
* * * 4. The Executive Committee, after receiving a recommendation from the President, will set a level of strike *79 benefits paid to the striking member which is consistent with the situations pertaining to that strike. * * * 6. No flight deck crew member may receive benefits unless his eligibility for same is certified by his LEC and which will be subject to his: a. Being available for and performing duties as required by the guidelines and criteria established by the MEC pertaining to the support of the action to resolve the dispute. b. Not engaging in any action or deed which might injure or adversely affect the successful outcome of the dispute. c. Not flying for another carrier engaged in a dispute with ALPA. d. Being in Good Standing before receiving benefits. 7. Apprentice members and nonmembers who cooperate in the effort may receive benefits if and when certified by the LEC. Cooperation shall consist of, as a minimum, Items (a), (b) and (c) in Paragraph 6 above.
On March 13, 1989, the executive committee, pursuant to section 65(B)(4) of the Manual, adopted the executive board's resolution to award strike benefits equally among the strikers, rather than awarding amounts calibrated to each striker's rank. This was apparently the first strike in ALPA's history *80 during which such egalitarian treatment was shown to the striking pilots. Following a discussion of the general needs of the pilots and the amount they could reasonably assess the membership, the executive committee set a flat monthly benefit of $ 2,400. The executive committee estimated that the benefit level would require a monthly assessment from members of about $ 35 for each $ 10,000 of annual income. On March 20, 1989, pursuant to section 65(A)(3) of the Manual, ALPA balloted the nonstriking members of the union to approve disbursement of benefits to striking pilots. Apparently the troubles at Eastern were a common topic of discussion in the flight industry, and there was general concern among pilots regarding Lorenzo's activities. The report accompanying the ballot included a letter from the executive committee urging ALPA members to vote for strike benefits. Your vote authorizing sympathy strike benefits for our brothers and sisters at Eastern not only supports their cause; it is also an investment in the future of our profession. Let no one doubt that our future is at risk if we permit Frank Lorenzo to squeeze from the hides of his employees a further competitive *81 advantage.
Three-quarters of the valid votes cast supported the resolution. To fund the benefits, all of the nonstriking ALPA pilots were obligated, pursuant to article 9, section 7(A)(1), of ALPA's constitution and bylaws (revised as of October 30, 1988), to pay the assessments. These members deducted the amount of the assessments on their 1989 Federal income tax returns as employee business expenses. The amount assessed was billed by ALPA to each nonstriking member and paid to ALPA's central treasury. If a member failed to pay, he was notified that he was in "bad standing". If that failure continued, the member would be expelled from the union, which could result in the termination of the pilot's employment with the airline. ALPA began distributing strike benefits approximately 35 days following the vote, issuing checks drawn on its administrative account. The first strike benefits were paid from ALPA's general account, and the general account was reimbursed by the major contingency fund. As the nonstriking pilots' assessments began coming in, the proceeds were deposited in the general account and subsequently transferred to the major contingency fund. Strike benefits *82 thereafter were paid from the major contingency fund, but pursuant to section 65(A)(4) of the Manual the major contingency fund was replenished through membership assessments. The benefit checks the striking pilots received indicated that payment was conditioned on each recipient's compliance with the duties outlined in section 65(B)(6) of the Manual. However, the striking pilots were not instructed by ALPA as to how they could spend the payments. ALPA balloted its nonstriking membership again on September 25, 1989, to continue paying strike benefits. The measure passed with 55 percent of the vote. Osborne was a member in good standing of ALPA at the time the strike was called. Dawson was not a member, but he maintained an "agency shop" relationship with the union, whereby the union would represent him in labor/management disputes. The pilot in an agency shop relationship with ALPA pays a service charge equal to the regular membership dues, but at the end of the year the pilot may request a refund for the portion of the assessment not allocable to representation; i.e., the costs of political or lobbying activities. It is a condition of continued employment with Eastern that *83 a nonmember maintain an agency shop relationship with ALPA. The strike ended November 22, 1989. ALPA balloted its members again to continue assisting the pilots for a short term. The voting pilots approved the measure by 56 percent, and petitioners continued to receive benefit checks through the early part of 1990. Following the strike, ALPA sent repayment requests to some Eastern pilots who were not eligible for the amount of strike benefits they received. Toward the end of 1990, Eastern offered to recall Dawson as a first officer, but he refused the position. Eastern went out of business soon thereafter. Dawson retired from his piloting career on March 1, 1991. Osborne continues to work as a pilot. ALPA issued each petitioner a Form 1099-MISC showing that $ 20,800 in strike benefits was paid for 1989. Neither petitioner reported the amount on his Federal income tax return for that year. Upon examination of the returns, respondent determined that the amounts received from ALPA were includable in gross income, and the notices of deficiency followed. OPINION Section 61(a) provides that Except as otherwise provided in this subtitle, gross income means all income from *84 whatever source derived, including (but not limited to) the following items: (1) Compensation for services, including fees, commissions, fringe benefits, and similar items;
Exemptions from gross income, having been specifically stated, should be construed with restraint. Commissioner v. Jacobson, 336 U.S. 28 (1949); Heard v. Commissioner, 326 F.2d 962 (8th Cir. 1964), affg. 40 T.C. 7 (1963); Publishers New Press, Inc. v. Commissioner, 42 T.C. 396, 400 (1964). Beginning with the Revenue Act of 1913, the Federal tax system has excluded from gross income amounts received as gifts. The 1939 Internal Revenue Code provided for this exclusion in section 22(b)(3), and the Internal Revenue Code of 1954 redesignated the exclusion as section 102(a). Section 102(a) provides that "Gross income does not include the value of property acquired by gift, bequest, devise, or inheritance." The term "gift", though a common expression, has significantly differing meanings in legal parlance. When used in reference to Federal estate and gift taxes, it generally means a transfer *85 of property for less than its fair market value. When used in reference to contract law, it generally means a transfer made for no legal consideration. The meaning of the term "gift" for purposes of section 102, however, has experienced a long and varied history of interpretation in the courts. Indeed, the first published opinion of the Board of Tax Appeals (the Board) dealt with the income tax definition of a gift. In Parrott v. Commissioner, 1 B.T.A. 1 (1924), revd. 8 F.2d 368 (E.D. Va. 1925), revd. 15 F.2d 669 (4th Cir. 1926), the Board rejected the taxpayer's claim that his employer/corporation intended the payment of a bonus to be a gift. The Board held that "We must judge the corporate intent from the corporate acts themselves, not from the interpretation placed upon them by some individual." Id. at 4. A corporate resolution authorized the directors to make "such distributions as they deem wise and proper." The Board interpreted "proper" as meaning "intra vires", and held that the making of a gift was not within the authority of the directors. The Board looked at the actions of the *86 corporate employer rather than the actions of the shareholders in finding that no "corporate intent" to make a gift existed. The Supreme Court relied on the Court of Appeals for the Fourth Circuit's decision in Parrott v. Commissioner, 15 F.2d 669 (4th Cir. 1926), in holding that a voluntary payment for services was compensation rather than a gift for income tax purposes. Old Colony Trust Co. v. Commissioner, 279 U.S. 716 (1929). The Supreme Court revisited the gift area in Bogardus v. Helvering, 302 U.S. 34 (1937), in which the shareholders of a corporation transferred "honoraria" to the employees of a former sister corporation. The Court of Appeals for the Second Circuit, affirming an order of the Board of Tax Appeals, held that although the transfer was a "legal gift", it was intended to be compensation for services, and thus was taxable to the recipients. Bogardus v. Helvering, 88 F.2d 646 (2d Cir. 1937). The Supreme Court in its reversal stated that If the sum of money under consideration was a gift and not compensation, it is exempt from taxation *87 and cannot be made taxable by resort to any form of subclassification. If it be in fact a gift, that is an end of the matter; and inquiry whether it is a gift of one sort or another is irrelevant. This is necessarily true, for since all gifts are made non-taxable, there can be no such thing under the statute as a taxable gift. A claim that it is a gift presents the sole and simple question whether its designation as such is genuine or fictitious -- that is to say, whether, though called a gift, it is in realty compensation. * * * [Bogardus v. Helvering, 302 U.S. at 40.]
The Court went on to say that the corporation was under no legal or moral duty to transfer money to the employees. "There is entirely lacking the constraining force of any moral or legal duty as well as the incentive of anticipated benefit of any kind beyond the satisfaction which flows from the performance of a generous act." Id. at 41. [3]
*88 In Commissioner v. LoBue, 351 U.S. 243 (1956), the Supreme Court again revisited the gift area and held that a corporation's grant of a stock option to an employee was not a gift for purposes of former section 22(b)(3) in that there was not the slightest indication of the kind of detached and disinterested generosity which might evidence a "gift" in the statutory sense. These transfers * * * bore none of the earmarks of a gift. They were made by a company engaged in operating a business for profit * * *. * * * The company was not giving something away for nothing. [Id. at 246-247; fn. ref. omitted.]
Four years later the Court decided the watershed case Commissioner v. Duberstein, 363 U.S. 278 (1960), in which a business associate had "given" the taxpayer a luxury automobile as thanks for client references. The Court reviewed its past course of distinguishing gifts excludable from gross income in stating that the mere absence of a legal or moral obligation * * * does not establish that * * * [a voluntarily executed transfer of property, without any consideration or compensation *89 therefor] is a gift. And, importantly, if the payment proceeds primarily from "the constraining force of any moral or legal duty," or from "the incentive of anticipated benefit" of an economic nature, it is not a gift. And, conversely, "[where the payment is in return for services rendered, it is irrelevant that the donor derives no economic benefit from it." * * * [Id. at 285; citations omitted.]
The Court established the hallmark of the excludable gift as a transfer that proceeds from a "detached and disinterested generosity," "out of affection, respect, admiration, charity or like impulses." And in this regard, the most critical consideration * * * is the transferor's "intention." "What controls is the intention with which payment, however voluntary, has been made." [Id. at 285-286; fn. ref. and citations omitted.]
The recipient's intent does not control whether there is a gift or compensation; the donor's intent is the decisive factor. United States v. Harris, 942 F.2d 1125, 1134 (7th Cir. 1991). On the same day the opinion in Duberstein was handed down, the Court *90 issued its opinion in United States v. Kaiser, 363 U.S. 299 (1960). In Kaiser the issue was whether certain strike benefits were taxable. The jury had concluded that they were gifts, but the District Court concluded that the benefits paid were not gifts as a matter of law. Kaiser v. United States, 158 F. Supp. 865 (E.D. Wis. 1958). The Court of Appeals reversed. Kaiser v. United States, 262 F.2d 367 (7th Cir. 1958). The Supreme Court affirmed the judgment of the Court of Appeals for the Seventh Circuit, concluding that there was evidence upon which the jury could have reasonably concluded that the benefits were gifts. United States v. Kaiser, supra.However, neither Duberstein nor Kaiser stands for the proposition that "every trier of the facts * * * [is] free for all future time to disregard guidelines that other trial and appellate courts [have] developed concerning the weight to be given to recurring 'relevant factual elements, with their various combinations'." Estate of Carter v. Commissioner, 453 F.2d 61, 64 (2d Cir. 1971) *91 (quoting Commissioner v. Duberstein, supra at 289), revg. T.C. Memo. 1970-305. In order to determine whether petitioners received gifts, it is first essential to determine who the "donor" is. Then we must decide whether the donor acted out of "detached and disinterested generosity". Petitioners suggest that ALPA was merely a conduit for the individual ALPA pilots to make gifts to their brethren. However, this argument ignores the very mechanisms through which the strike benefits were paid. In one sense, a union is an unincorporated partnership of its members, and as such it has no legal existence as a separate entity; thus, a lawsuit brought against a union by a third party is actually prosecuted against its membership. United Mine Workers v. Coronado Coal Co., 259 U.S. 344 (1922). However, the relationship between each individual member and the union itself is created and governed by the constitution and bylaws of the union. Structurally and functionally, a labor union is an institution which involves more than the private or personal interests of its members. It represents organized, institutional activity *92 as contrasted with wholly individual activity. This difference is as well defined as that existing between individual members of the union. * * * The union engages in a multitude of business and other official concerted activities, none of which can be said to be the private undertakings of the members. * * * [United States v. White, 322 U.S. 694, 701-702 (1944); fn. ref. omitted.]
In this case the strike benefits and assessments were authorized pursuant to voting and assessment procedures established by ALPA in the Manual. The nonstriking pilots paid their assessments to ALPA as an obligation of membership, and ALPA distributed benefits pursuant to ALPA policy. As articulated by the California Supreme Court: Dues and assessments paid by members to an association become the property of the association and any severable or individual interest therein ceases upon such payment. As such property they are subject to disbursement and expenditure by the association in pursuit of the lawful object or objects for which they were designated to be expended. [DeMille v. American Federation of Radio Artists, 187 P.2d 769, 776 (Cal. 1947); *93 citations omitted.]
Clearly, ALPA was the grantor of the strike benefits in this case. Although the member assessments were the ultimate source of the strike benefits, the payments represented union property distributed by the union. See United States v. Kaiser, supra at 315 (Frankfurter, J., concurring); Halsor v. Lethert, 240 F.Supp. 738 (D. Minn. 1965); Godwin v. United States, 65-1 USTC par. 9121 (W.D. Tenn. 1964). [4]
*94 Turning to the question of ALPA's intent, we note initially that neither ALPA's constitution nor the Manual expressly authorizes the awarding of gifts by the union. The officers of a union are bound to "hold its [the union's] money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder". 29 U.S.C. sec. 501(a) (1994). The fact that an organization's governing instrument does not authorize the giving of gifts suggests that the organization did not make a gift. See Parrott v. Commissioner, 1 B.T.A. 1 (1924). In Colwell v. Commissioner, 64 T.C. 584, 587 (1975), this Court discussed a number of other salient factors to be considered in determining whether strike benefits paid by a union are excludable from the recipient's income as a gift. These factors are (1) whether the union was under a moral or legal obligation to make the payments; (2) whether the payments were made upon a consideration of the recipient's financial *95 status and need; (3) whether the benefits continued during the strike regardless of whether the recipient worked elsewhere; (4) whether the recipient was a member of the striking union; (5) whether the payments required the recipient to perform any strike duties such as picketing, and if not, whether or to what extent the recipient was under a moral obligation to participate in such strike activities; and (6) whether any restrictions were placed on the use of the payments, particularly in regard to whether the benefits were restricted to payment of basic necessities such as food and shelter or whether the recipient had unfettered control over use of the funds. An analysis of these factors leads to the conclusion that the amounts paid to the striking pilots were not gifts within the meaning of section 102(a). While initially ALPA may not have had a legal obligation to pay strike benefits to any striking pilots at the time the strike was called, once the balloting process was completed pursuant to APLA's operating policy, and strike benefits were authorized, there was at least a moral obligation for ALPA to disburse payments to the striking pilots. See Brown v. Commissioner, 47 T.C. 399, 408 (1967), *96 affd. per curiam 398 F.2d 832 (6th Cir. 1968), where strike benefits paid by ALPA were held to be taxable to the recipients. ALPA did not look at the individual needs of the pilots. Consequently, it is impossible to distinguish any benefits as being paid out of a detached and disinterested generosity or for other charitable purposes, rather than from a desire to promote the success of the strike. Colwell v. Commissioner, supra at 588. The benefits were set at a level, rather, that ALPA considered acceptable to both striking and nonstriking pilots. The individual financial condition of each striking pilot was at no time taken into account. Cf. Woody v. United States, 368 F.2d 668 (9th Cir. 1966); Brown v. Commissioner, supra; Godwin v. United States, supra.
Osborne was a member of ALPA, but Dawson was not. Union status, however, had apparently no bearing on the receipt of strike benefits. The Manual provided for the payment of benefits to members as well as nonmembers, in the discretion of the board of directors *97 (with the support of a majority of the membership). Once the benefits were authorized for the striking Eastern pilots, union membership was no longer a consideration. Although in some circumstances union membership may be an important factor, here the distinction is irrelevant. Petitioners argue that although they participated in strike activities, their receipt of strike benefits was not conditioned on participation. According to the Manual, however, neither pilot could receive benefits unless he was certified by his LEC as eligible to receive benefits. The LEC would certify a pilot only if he or she were available for and performing any strike activities ALPA asked, not flying for another airline in dispute with ALPA, and not doing any action that would adversely affect the outcome of the dispute. Thus, while payments may not have been conditioned on the performance of specific strike duties, striking pilots had a general duty to back ALPA in its endeavor. Cf. Brown v. Commissioner, supra at 408; Hagar v. Commissioner, 43 T.C. 468, 484 (1965). It is significant that ALPA sought repayment from those pilots who *98 were not eligible under ALPA policy to receive strike benefits; this further indicates that ALPA's intention in making the payments was not out of charitable impulse. The striking pilots were unrestricted in the use of the ALPA payments. Payment was not made in the form of vouchers earmarked for basic necessities, as was the case in United States v. Kaiser, 363 U.S. 299 (1960). Benefits were paid by check and could have been used for an extended vacation rather than for rent or other basic needs. This reflects upon the union's self-interest in making the payments, as it gives the striking pilots incentive to support the strike. Colwell v. Commissioner, supra at 589. Petitioners focus on the circumstances that motivated ALPA to strike against Eastern, chronicling the asserted malefactions of Eastern's management. To the extent, however, that this is material, it weighs against petitioners rather than for them. The more egregious the management's behavior, the greater was ALPA's interest in holding a successful strike. ALPA's impulse in funding such a strike could hardly be characterized as detached and disinterested. *99 Petitioners seek support in the result in United States v. Kaiser, supra. The underlying facts here, however, stand in sharp contrast to those in Kaiser. For example, in Kaiser the benefits were paid in rent and food vouchers, and the amounts were based on need and were relatively small. Thus, the Supreme Court reinstated the jury's decision that the union made a gift, as the evidence supported such a finding. [The jury] had the power to conclude, on the record, taking into account such factors as the form and amount of the assistance and the conditions of personal need, of lack of other sources of income, compensation, or public assistance, and of dependency status, which surrounded the program under which it was rendered, that while the assistance was furnished only to strikers, it was not a recompense for striking. They could have concluded that the very general language of the Union's constitution, when considered with the nature of the Union as an entity and with the factors to which we have just referred, did not indicate that basically the assistance proceeded from any constraint of moral or legal obligation, of a nature *100 that would preclude it from being a gift. And on all these circumstances, the jury could have concluded that assistance, rendered as it was to a class of persons in the community in economic need, proceeded primarily from generosity or charity, rather than from the incentive of anticipated economic benefit. * * * [United States v. Kaiser, supra at 304.]
It is clear that ALPA had a primary goal of ensuring the economic security of its membership and that strike benefits were paid to that end. In sum, there is no evidence supporting the suggestion that ALPA paid the benefits out of a detached and disinterested generosity. See Godwin v. United States, 65-1 USTC par. 9121 (W.D. Tenn. 1964). Petitioners seem to argue that, rather than receiving taxable income, they were actually suffering an economic loss by exchanging their high-salaried positions for $ 20,800 in strike benefits. We understand that the pilots strike created personal and professional hardships on the men and women involved. However, this type of "loss" is not acknowledged for tax purposes. See Hort v. Commissioner, 313 U.S. 28 (1941). *101 Further, even if the strike benefits were paid as a replacement of lost earnings, as the earnings would have been taxed so too would their replacement. United States v. Safety Car Heating Co., 297 U.S. 88, 98 (1936). Based on the foregoing, Decision will be entered under Rule 155 in docket No. 8455-93. Decision will be entered for respondent in docket No. 14846-93. Footnotes
1. Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the year in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Respondent has conceded the self-employment income tax issue and all additions to tax in docket No. 8455-93.↩
3. Bogardus v. Helvering, 302 U.S. 34 (1937), was the leading case in the gift area for some time. Courts found gifts under that standard in cases involving members of the clergy who received honoraria upon leaving their congregation. See Abernethy v. Commissioner, 211 F.2d 651 (D.C. Cir. 1954), revg. 20 T.C. 593 (1953); Kavanagh v. Hershman, 210 F.2d 654 (6th Cir. 1954); Mutch v. Commissioner, 209 F.2d 390 (3d Cir. 1954); Schall v. Commissioner, 174 F.2d 893 (5th Cir. 1949), revg. 11 T.C. 111 (1948). In Rev. Rul. 55-422, 1955-1 C.B. 14↩, the Service indicated that a payment by a congregation to a retiring clergyman would qualify as an excludable gift where, among other circumstances, there was a closer personal relationship between the recipient and the congregation than is found in secular employment situations.
4. Even if we were to ignore the economic and legal realities and accept petitioners' conduit theory, there is no evidence indicating that the pilots cast their votes and paid their assessments with donative intent. Indeed, support for strike benefits at times dipped to little more than half of the voting membership. Further, regardless whether they agreed with the strike, the ALPA pilots were required to pay assessments. We would be hard pressed to find a detached and disinterested generosity where the individual union members are bound by the decision of the union majority in this way. Placko v. Commissioner, 74 T.C. 452 (1980). Petitioners point to the camaraderie of airline pilots, stemming from their shared experiences, to indicate that the nonstriking pilots paid their assessments out of detached generosity. The only evidence that demonstrates any intent of the pilots in supporting the strike benefits, however, is the letter circulated with the first ballot. It appeals to the working pilots' self-interest by classifying the strike assessments as "an investment in the future of our profession." Further, as noted in Jernigan v. Commissioner, T.C. Memo. 1968-18↩, we find it difficult to attribute a detached and disinterested generosity to the actions of the individual union members, who may have supported the strike with the thought that "If I pay to help others on strike, they'll pay to help me when I'm on strike."